IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DONNA FRYER and BARBARA DAVISON, | CV 22-14-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER ADOPTING MAGISTRATE'S FINDINGS AND RECOMMENDATIONS |
| UMIA, an insurance company, and CONSTELLATION, INC., a mutual insurance holding company, doing business as "Constellation®", | |
| Defendants. | |

United States Magistrate Judge Timothy Cavan filed Findings and Recommendations in this matter on January 17, 2025. (Doc. 121). Judge Cavan recommended the Court deny Defendants UMIA Insurance, Inc.'s and Constellation, Inc.'s (collectively "UMIA") Motion for Summary Judgment (Doc. 73). Similarly, Judge Cavan recommended the Court deny Donna Fryer's and Barbara Davison's ("Plaintiffs") Motion for Partial Summary Judgment Re: "reasonably clear liability" and Motion for Partial Summary Judgment as to Defendants' Seventh Affirmative Defense: "fraud" or "violation of law." (Docs. 76, 80).

The parties timely objected to the Findings and Recommendations. (Docs. 123, 124). The parties timely responded to the objections. (Docs. 127, 128). After

1

careful review of the objections and responses, the Court adopts Judge Cavan's Findings and Recommendations.

## I.    Legal Standard

### A.    *Findings and Recommendations*

The parties are entitled to a de novo review of those findings to which they have "properly objected." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1). An objection is proper if it "identif[ies] the parts of the magistrate's disposition that the party finds objectionable and present[s] legal argument and supporting authority, such that the district court is able to identify the issues and the reasons supporting a contrary result." *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 4102940, at *2 (D. Mont. Oct. 18, 2010). "It is not sufficient for the objecting party to merely restate arguments made before the magistrate or to incorporate those arguments by reference." *Id.* Objections are not "a vehicle for the losing party to relitigate its case." *Hagberg v. Astrue*, 2009 WL 3386595, at *1 (D. Mont. Oct. 14, 2009) (citation omitted).

The portions of the findings and recommendations not properly objected to or not objected to by any party will be reviewed for clear error. *See McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Clear error exists if the court is left with a "definite and firm conviction that a mistake has been committed." *McMillan v.*

*United States*, 112 F.3d 1040, 1044 (9th Cir. 1997) (citation omitted). The court may accept, reject, or modify, in whole or in part, those findings and recommendations objected to. 28 U.S.C. § 636(b)(1).

The District of Montana Local Rule 72.3(a) provides that an objection to a magistrate judge's findings and recommendations must itemize:

> (1) each factual finding of the magistrate judge to which objection is made, identifying the evidence in the record the party relies on to contradict that finding; and

> (2) each recommendation of the magistrate judge to which objection is made, setting forth the authority the party relies on to contradict that recommendation.

D. Mont. L. R. 72.3(a).

### B.    *Summary Judgment*

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When making a summary judgment determination,

the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See id.* at 587.

## II.    Background

### A.    The Underlying Claims

Donna Fryer and Barbara Davison ("Plaintiffs") were patients of Dr. Enrico Arguelles at his clinic, the Arthritis & Osteoporosis Center ("AOC"), in Billings, Montana. In September 2009, Dr. Arguelles diagnosed and treated Fryer for sero-negative rheumatoid arthritis. (Doc. 77-1 at 1–6). In 2016, Fryer obtained a second opinion calling Dr. Arguelles' diagnosis into question. (*Id.* at 35–40). Similarly, in January 2014, Dr. Arguelles diagnosed and treated Davison for sero-negative rheumatoid arthritis. (*Id.* at 41–42). In 2017, Davison obtained a second opinion calling Dr. Arguelles' diagnosis into question. (*Id.* at 45–46).

On May 5, 2017, Fryer filed an Application for Review of Claim with the Montana Medical Legal Panel ("MMLP"). (Doc. 74-1 at 110–13). She alleged that Dr. Arguelles' diagnosis "was without any medical basis" and that Dr. Arguelles "knew or should have known that she did not . . . have [rheumatoid arthritis]." (*Id.* at 112). Similarly, Davison filed an Application for Review of Claim with the MMLP on January 31, 2018. (*Id.* at 260–64). Dr. Arguelles tendered defense of the MMLP claims to UMIA, and UMIA retained attorney Gary Kalkstein to defend Dr. Arguelles. (Doc. 74 at 3).

4

At all times relevant, Dr. Arguelles and the AOC were insured under UMIA professional liability policies. (Doc. 74-1 at 265–409). From January 1, 2017 to January 1, 2018, Dr. Arguelles was covered under policy number MT30713 and the AOC under policy number MT200018 (the "2017 Policies"). Fryer triggered the 2017 Policies when she filed her claim with the MMLP in 2017. The 2017 Policies contained the following exclusions:

> **Exclusions for violation of law.** We will not cover any claims resulting from your acts which are in violation of any law, statute, ordinance or regulation.

> **Exclusion for punitive or exemplary damages.** We will not pay any punitive or exemplary damages. We will defend you, however, against any claim for such damages as long as they result from a claim for damages otherwise covered by this section.

(*Id.* at 278–79, 314–15). From January 1, 2018 to January 1, 2019, Dr. Arguelles was covered under policy number MT307713 and the AOC under policy number MT200018 (the "2018 Policies"). Davison triggered the 2018 Policies when she filed her claim with the MMLP in 2018. The 2018 Policies contained the following exclusions:

> C. CRIMINAL OR KNOWINGLY WRONGFUL ACTS

> This insurance does not apply to any *claim* arising out of a criminal, willful, malicious, fraudulent, dishonest or knowingly wrongful act committed by or with the knowledge of the *insured*.

> H. VIOLATION OF LAW

> This insurance does not apply to any *claim* arising out of the violation of any local, state or federal statute, rule or regulation.

5

(*Id.* at 324–25, 374–75).

After the MMLP entered its decision in January 2018, Fryer filed a medical malpractice lawsuit against Dr. Arguelles and the AOC in Montana State District Court on October 3, 2018. (*Id.* at 416–26). On December 24, 2018, Davison also filed a medical malpractice lawsuit against Dr. Arguelles and the AOC in Montana State District Court.[1] (*Id.* at 493–503). In March 2019, Michael Eiselein, counsel for Fryer and Davison, served the Fryer and Davison Complaints on Dr. Arguelles and the AOC. (*Id.* at 793–74).

B.    *Federal Investigation of Dr. Arguelles and the AOC*

While Fryer and Davison were patients at the AOC, the United States Department of Justice ("DOJ") investigated Dr. Arguelles and the AOC for certain federal health care offenses. (*Id.* at 3 ("health care offenses as defined in 18 U.S.C. § 24(a); violations or conspiracies to violate 18 U.S.C. § 669, 1035, 1347, or 1518; or 18 U.S.C. §§ 287, 371, 664, 1001, 1027, 1341, 1343, or 1954")). On April 13, 2015, the DOJ issued a subpoena to Dr. Arguelles and the AOC requesting thirty patients' health care records from January 1, 2010 to December 31, 2013. (*Id.* at 3–6). Dr. Arguelles tendered the subpoena to UMIA who reimbursed him for the costs of responding to the subpoena. (*Id.* at 30).

---

[1] Judge Cavan and the parties refer to the Plaintiffs' medical malpractice lawsuits as the "Underlying Claims." This Court will also refer to the 2018 lawsuits as the "Underlying Claims."

Between March and April 2017, the Health and Human Services branch of the Office of Inspector General, FBI officials, and Montana Medicaid Fraud Control officials raided the AOC pursuant to a search warrant. (*Id.* at 411–15; Doc. 82 at 6). According to a local news article published on April 19, 2017, numerous AOC patients contacted federal investigators with questions and concerns about the medical treatment they had received. (Doc. 74-1 at 414–15).

Throughout 2017, UMIA's counsel Kalkstein, communicated with UMIA Senior Claim Consultant Kim Day. While representing Dr. Arguelles, Kalkstein emailed Day with attached local newspaper articles reporting the raid and the resulting search of the AOC. (*Id.* at 410). On June 27, 2017, Kalkstein forwarded Day an email from Dr. Arguelles' criminal counsel. (*Id.* at 544–45). The email discussed significant concerns with MRI imaging Dr. Arguelles used. (*Id.* at 545). Specifically, the email recounted a discussion between Dr. Jon Moses of NorthGauge Health Advisors and Dr. Michael Staloch, a radiologist. (*Id.*). The email stated that Dr. Staloch had "significant concerns" with MRI imaging Dr. Arguelles used, relaying to Dr. Moses that "this appears fraudulent."[2] (*Id.*).

On August 18, 2017, Kalkstein sent a letter to Day detailing a meeting between himself, Dr. Arguelles' personal counsel, and Dr. Arguelles' criminal

---

[2] Plaintiffs object to Judge Cavan's reliance on this fact by arguing it is inadmissible hearsay. (Doc. 4–5). The Court will address the hearsay objection in its Discussion section.

counsel. (*Id.* at 547–50). The letter stated that Dr. Arguelles' criminal counsel had advised him to invoke the Fifth Amendment at any MMLP hearing or civil suit. (*Id.*). Kalkstein "suggested strongly that [taking the Fifth] was a poor idea for a number of reasons, including but not limited to the fact that the civil remedy relative to sanctions to a defendant taking the Fifth include the possibility of default judgment being entered against [him]." (*Id.* at 548).

### C.    Settlement Demand

Before Davison filed her complaint in state court, Day provided her managers at UMIA with a summary of the Davison claim and set reserves in the December 2018 Reserve Report. (*Id.* at 645–49). Day reported on Davison's MMLP claim and MMLP's hearing and noted that "Dr. Arguelles is under investigation by the Department of Justice for Medicare fraud. The investigation is currently ongoing and active." (*Id.* at 646). She further reported that UMIA did not have a standard of care expert, and that it was unable to find expert support in two other cases against Dr. Arguelles. (*Id.* at 648). Day recommended setting reserves at $950,000 for Dr. Arguelles and $5,000 for the AOC. (*Id.* at 649). Day projected "conservative" values of $500,000–$600,000 in past medical special damages, $200,000 in future medical special damages, and $250,000 for the statutory cap on non-economic damages. (*Id.*). She further rated defensibility as "Clear Liability (0-10%)." (*Id.*).

On November 6, 2019, Eiselein sent Kalkstein and Dr. Arguelles' personal counsel a settlement demand in the Davison claim for $865,069.59. (*Id.* at 800). Davison's demand included: (1) cost for unnecessary Remicade treatment—$265,200; (2) medical bills for ICU admission—$136,808; (3) medical bills from New Hope—$11,541; (4) lost wages—$201,520; and (5) non-economic damages—$250,000 – $1,000,000. (*Id.* at 800). On December 15, 2019, Eiselein sent Kalkstein and Dr. Arguelles' personal counsel a settlement demand in the Fryer claim for $856,041. (*Id.* at 859). Fryer's demand included: (1) cost for unnecessary Remicade treatment—$567,041; (2) out of pocket expenses—$37,700; (3) travel expenses—$6,300; and (4) non-economic damages—$250,000 – $1,000,000. (*Id.*).

After receiving the settlement demands, Day updated and drafted the January 2020 Reserve. (*Id.* at 899–920). Day recommended setting the Fryer reserve at $700,000 and the Davison reserve at $750,000. (*Id.* at 909, 920). The January Reports projected probable verdict ranges of $850,000 – $1,000,000 for Fryer and $850,548 – $900,548 for Davison. (*Id.* at 908, 919). The Reports estimated a less than 10% global chance of a successful defense. (*Id.*).

Additionally, the Reports recounted pertinent background information including facts that: (1) UMIA had issued Reservation of Rights letters to Dr. Arguelles "based on the language in the MMLP Application that Dr. Arguelles may have known the diagnosis was fraudulent;" (2) Dr. Arguelles was a target of federal

9

criminal investigation, though no indictment had been issued; and (3) Dr. Arguelles' criminal counsel instructed him to invoke the Fifth Amendment if he were examined under oath in a medical malpractice case. (*Id.* at 900–01, 911–12).

Further, the January 2020 Reports included UMIA expert opinions regarding a standard of care and causation analysis. Dr. John McCahan, a board-certified rheumatologist, stated that after reviewing Dr. Arguelles' care "he was frankly taken back by what he feels was the magnitude and scale of Dr. Arguelles' egregious malpractice and inappropriate, costly and dangerous treatment and the damaging consequences to each of these patients." (*Id.* at 906, 916–17). Dr. Suzanne Shaw, a board-certified radiologist, conducted a blind review of patient imaging. She noted the images' poor quality but otherwise she saw nothing of interest besides minor degenerative changes. (*Id.* at 906, 917). When Dr. Shaw learned that the patient had been diagnosed with rheumatoid arthritis, "she asked if this was a scam." (*Id.* at 906).

In March 2020, UMIA representatives convened via a Large Loss Committee to discuss the claims against Dr. Arguelles. (*Id.* at 1055). After Day presented at the Large Loss Committee, the Committee requested that Day obtain medical bills and liens from Fryer and Davison to support damages claims before settlement authority would be considered. (*Id.* at 695, 964–95).

Day updated her Reserve Reports on June 23, 2020. (*Id.* at 1129–52). The updated Reports included additional reviews from UMIA experts. Dr. Allen Sawitzke, a board-certified rheumatologist, opined that Dr. Arguelles departed from the standard of care required of a board-certified rheumatologist. (*Id.* at 1136–37, 1148–49). Likewise, Dr. Devon Klein, a board-certified radiologist, did not support Dr. Arguelles' standard of care. (*Id.* at 1137–38, 1149). The June 2020 Reports otherwise remained the same as the January 2020 Reports, including Day's renewed request for up to $700,000 to resolve the Fryer claim and $900,000 to resolve the Davison claim. (*Id.* at 1140, 1152).

On July 6, 2020, Fryer and Davison each filed an Amended Complaint adding causes of action for fraud and constructive fraud and seeking punitive damages from Dr. Arguelles. (*Id.* at 1154–79). On July 17, 2020, Eiselein provided UMIA with a medical lien packet for Fryer's claim, totaling at $49,535.54. (*Id.* at 1180–85). On October 7, 2020, Eiselein provided UMIA with a medical lien packet for Davison's claim, totaling $0. (*Id.* at 1197–202). The parties dispute the significance of the lien amounts. However, the totals were substantially less than what Day allocated for when she set UMIA's reserves.

On August 21, 2020, Kalkstein wrote a letter to Day advising her that he had spoken on the phone with Dr. Arguelles and Dr. Arguelles' personal counsel. (Doc. 77-1 at 112–13). According to Kalkstein, Dr. Arguelles "believe[d] his care was a

departure from the standard of care required of a board-certified rheumatologist" and reiterated his demand to settle the case. (*Id.* at 112). Kalkstein stated that the matter was not defensible and believed that efforts should be made to resolve the matter at mediation. (*Id.* at 112–13). The Court notes that at his deposition for the current matter, Dr. Arguelles denied making a statement that he departed from the standard of care. (Doc. 74-1 at 47–48). Instead, Dr. Arguelles maintains that his treatment of Davison and Fryer was appropriate and met the standard of care. (*Id.* at 20, 22).

### D. Settlement

In January 2021, Montana State District Judge Michael Moses mediated the Fryer and Davison claims. (*Id.* at 723–24). On April 6, 2021, Fryer settled her claims against Dr. Arguelles for $480,000. (*Id.* at 1224–30). UMIA paid $250,000 and Dr. Arguelles paid $230,000 of Fryer's settlement. (*Id.* at 1228). On February 26, 2021, Davison settled her claims against Dr. Arguelles for $375,000. (*Id.* at 1233–36). UMIA paid $250,000 and Dr. Arguelles paid $125,000 of Davison's settlement. (*Id.* at 54).

On July 7, 2021, Dr. Arguelles and the AOC settled with the federal government for $1,268,646 in exchange for a release of civil claims against him for violations of the False Claims Act, Civil Monetary Penalties Law, Program Fraud Civil Remedies Act, and common law theories of payment by mistake, unjust enrichment, and fraud. (*Id.* at 1237–244).

12

### E.    Procedural Background

On January 13, 2022, Plaintiffs sued UMIA for violation of the Montana Unfair Trade Practices Act ("UTPA")[3] in Montana State District Court for its handling of the Underlying Claims. (Doc. 1-4). Plaintiffs seek compensatory and punitive damages. (*Id.* at 10). UMIA removed the action to this Court based on diversity of citizenship. (Doc. 1). Pertinent here, UMIA asserts an affirmative defense under the UTPA that it had a reasonable basis in law or in fact to contest Plaintiffs' Underlying Claims. (Doc. 2).

On April 12, 2024, UMIA filed a Motion for Summary Judgment as to Plaintiffs' UTPA claims. (Doc. 73). The same day, Plaintiffs filed a Motion for Partial Summary Judgment Re: "reasonably clear liability" and a Motion for Partial Summary Judgment as to Defendants' Seventh Affirmative Defense: "fraud" or "violation of law." (Docs. 76, 80). Judge Cavan denied all Motions in his Findings and Recommendations. (Doc. 121).

## III.    Discussion

UMIA filed the following objections (Doc. 123) to Judge Cavan's Findings and Recommendations:

---

[3] Initially, Plaintiffs also asserted a claim for abuse of process against UMIA but have voluntarily dismissed the claim. (Doc. 27).

(1)    Judge Cavan incorrectly concluded that factual issues preclude ruling that UMIA had a reasonable basis to dispute coverage, damages, and/or liability for Plaintiffs' claims.

(2)    Judge Cavan incorrectly determined that UMIA did not delineate which elements of damages the Plaintiffs are seeking that are solely related to the treatment rendered by Dr. Arguelles.

(3)    Judge Cavan incorrectly determined that Plaintiffs could proceed with their claims for punitive damages.

Plaintiffs filed the following objections (Doc. 124) to Judge Cavan's Findings and Recommendations:

(1)    Judge Cavan incorrectly determined that there is a genuine issue of material fact regarding UMIA's clear liability.

(2)    Judge Cavan incorrectly determined that there is a genuine issue of material fact regarding UMIA's fraud defense.

The Court finds that the parties properly objected to Judge Cavan's Findings and Recommendations except for UMIA's objection to punitive damages. Accordingly, the Court will conduct a de novo review of the proper objections and will review the punitive damages finding for clear error. The Court will first address the parties' objections related to Montana's UTPA claims including UMIA's reasonable basis defense and Plaintiffs' arguments regarding clear liability and

14

fraud/violation of law. The Court will then address UMIA's objections related to damages.

### A.   Montana's UTPA

Under Montana's UTPA, "a third-party claimant [may bring] an independent cause of action against an insurer for actual damages caused by the insurers violation of 33-18-201(1), (4), (5), (6), (9), or (13)." Mont. Code Ann. § 33-18-242(1) (2021).[4] The provisions of § 33-18-201 relevant to this case state that it is unlawful for an insurer to:

> (4) refuse to pay claims without conducting a reasonable investigation based upon all available information;
>
> (5) fail to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; [and/or]
>
> (6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

*Id.* § 33-18-201(4)–(6).

#### 1.   UMIA's Objection Regarding its Reasonable Basis Defense

An insurer may not be held liable under Montana's UTPA if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is at issue. *Id.* § 33-18-242(6). It is the insurer's burden to establish by

---

[4] Montana Code Annotated was amended in October 2023 to reflect changes made by the Montana legislature during the 68th legislative session. These changes include amendments to the UTPA and other provisions relevant in this matter. However, because the Plaintiffs' complaint was filed in September 2022, the Court applies the law in effect at that time.

a preponderance of the evidence its reasonable basis defense. *Redies v. Att'ys Liab. Prot. Soc'y*, 150 P.3d 930, 937 (Mont. 2007). In general, the reasonableness assessment is a question of fact that falls within the province of the trier-of-fact. *Id.* at 938.

Montana recognizes two exceptions to the general trier-of-fact rule. First, the trier-of-fact rule does not apply "when there [is] no insurance policy in effect at the time the injury occurred." *Id.* Second, "the rule 'is not necessary in a summary judgment proceeding where the underlying 'basis *in law*' [for contesting the claim or the amount of the claim] is grounded on a legal conclusion, and no issues of fact remain in dispute." *Id.* (citing *Watters v. Guar. Nat. Ins. Co.*, 3 P.3d 626, 639 (Mont. 2000)). In short, a court may determine reasonableness as a question of law "when it depends entirely on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents." *Id.*

Accordingly, the court must look to the relevant legal landscape to determine whether UMIA had a "reasonable basis in law" for contesting the Plaintiffs' Underlying Claims or the amount of the Underlying Claims. *Id.* at 938–39. "The reviewing court is not to ask whether it 'agree[s] with the plaintiff[s'] theories of liability in the underlying suit but rather, whether the insurer's grounds for contesting those theories were reasonable under the existing law.'" *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 418 (Mont. 2013) (quoting *Redies*, 150 P.3d

at 939). "In the absence of caselaw on point, 'the determinative question' is whether the law in effect at the time, caselaw or statutory, provided sufficient guidance to signal to a reasonable insurer that its grounds for denying the claim were not meritorious." *Id.* (quoting *Redies*, 150 P.3d at 940).

Because UMIA's policy was in effect when Plaintiffs filed their Underlying Claims, Judge Cavan correctly considered UMIA's reasonable basis defense under the second exception to the general trier-in-fact rule. (Doc. 121 at 15–16). Judge Cavan found that "UMIA's reasonable basis defense [was] not grounded on its interpretation of legal precedent in its coverage determination." (*Id.* at 16). Rather, Judge Cavan found UMIA's defense "turn[ed] entirely on competing facts" and thus, the question of whether UMIA had reasonable basis for contesting Plaintiffs' claims was not appropriate for summary judgment. (*Id.* at 17). In reviewing the record, Judge Cavan determined there were questions of fact as to: (1) whether liability was reasonably clear at the time of the Underlying Claims, (2) whether Plaintiffs' Underlying Claims were excluded from UMIA's policy coverage under the fraud or violation of law exclusions, and (3) whether UMIA had a reasonable basis to contest Plaintiffs' damages as to the Underlying Claims. UMIA objects to this finding.

a. Whether Liability was Reasonably Clear

First, UMIA argues that liability was not reasonably clear as a matter of law because Dr. Arguelles denied that he breached the standard of care when treating the

Plaintiffs. (Doc. 123 at 10). UMIA points out that Dr. Arguelles maintains his patient care was reasonable and necessary. (*Id.* (citing Doc. 74-1 at 20, 22)). Because Dr. Arguelles denied and continues to deny personal liability for Plaintiffs' alleged injuries, UMIA argues that its liability under the 2017 and 2018 Policies was not reasonably clear during pre-suit mediation. (Doc. 123 at 10).

Here, UMIA fails to demonstrate how it relied on legal precedent to conclude that its liability was not reasonably clear at the pre-litigation stage. At the summary judgment phase, the Court may only determine "a reasonable basis" defense when it is a question of law. A question of law exists "when it depends entirely on interpreting legal precedents." *Redies*, 150 P.3d at 938. It follows then, that without legal precedent, the Court cannot engage in a reasonable basis in law defense analysis. Without a basis in law, UMIA's argument rests on the assumption that it is appropriate for the Court to determine whether UMIA's Policies' coverage exclusions applied based on triable facts regarding the Underlying Claims. This determination is not appropriate for summary judgment.

In addition to the facts UMIA proffered for its reasonable defense basis, Judge Cavan found that UMIA's internal assessments indicated that Dr. Arguelles breached the standard of care. (Doc. 121 at 17). For example, almost every expert noted in UMIA's January and June 2020 Reserve Reports found that Dr. Arguelles failed to comply with the standard of care. (Doc. 74-1 at 906, 916–17, 1136–38,

1147–50).  Additionally, UMIA Claims Consultant Day noted that Dr. Arguelles "continues to adamantly defend himself in the face of overwhelming evidence that he erred in his diagnosis or judgment." (*Id.* at 908, 919).

Like in its Motion for Summary Judgment, UMIA asks the Court to determine whether liability is "reasonably clear" at summary judgment based on triable facts underlying Plaintiffs' malpractice claims.  This request does not rest entirely on interpreting relevant legal precedents and thus, UMIA's defense depends on a reasonable basis in fact, not in law.  As Judge Cavan correctly found, a reasonable basis in fact determination is inappropriate for summary judgment.  For these reasons, the Court adopts Judge Cavan's findings as to whether liability was reasonably clear at the time of the Underlying Claims.

            b.  Whether Plaintiffs' Underlying Claims were Excluded from UMIA's Policy Coverage under the Fraud or Violation of Law Exclusions

Second, as to UMIA's Policies excluding fraud or violation of law from coverage, UMIA argues that "Montana law does not require that UMIA definitively establish that there was no coverage . . . before reasonably considering coverage issues in settlement discussions." (Doc. 123 at 7).  UMIA contends that during pre-suit mediation, it "had a duty to defend *all* claims asserted against Dr. Arguelles — *both covered and uncovered.*" (*Id.* at 8).  Now, UMIA argues it had a reasonable basis in law to dispute coverage of Dr. Arguelles because: (1) the DOJ actively

investigated Dr. Arguelles for suspected healthcare fraud, (2) Plaintiffs asserted in their MMLP claims and their Underlying Claims that Dr. Arguelles committed fraud, (3) several experts noted that Dr. Arguelles' conduct "appeared fraudulent," and (4) Dr. Arguelles' criminal counsel informed UMIA that he would invoke his Fifth Amendment rights at deposition or trial. (*Id.* at 6–8). Based on the facts, UMIA argues it "certainly had a reasonable basis in law to dispute coverage on some or all claims at [ ] mediation, and that basis clearly precludes the UTPA claims now asserted against UMIA in this case." (*Id.* at 8).

Again, UMIA fails to demonstrate how it relied on legal precedent to conclude that an insurer's coverage exclusion at the pre-litigation stage serves as an absolute defense to the UTPA claim. UMIA cites generally to the reasonable basis defense rule in *State Farm Mutual Automobile Insurance Company v. Freyer*. However, UMIA does not demonstrate how it relied on *Freyer* to contest Plaintiffs' Underlying Claims. Nevertheless, the Court will look to *Freyer* for guidance.

In *Freyer*, State Farm contested coverage for the plaintiff's derivative claim arising from a multi-person car accident, for which it paid plaintiff $50,000. *Freyer*, 312 P.3d at 408. State Farm believed it satisfied its obligation under the policy because the "Each Person" provision unambiguously limited coverage to $50,000 for all claims arising from bodily injury to one person. *Id.* After the plaintiff challenged the "Each Person" provision's interpretation, State Farm contacted its in-

house counsel. *Id.* at 403. In-house counsel advised State Farm that Montana courts'

majority rule stated that all derivative claims were subject to the $50,000 coverage

limit and State Farm was correct to deny the plaintiff coverage that it already paid

under the "Each Person" provision. *Id.* Based on in-house counsel's advice, State

Farm did not pay an additional $50,000 to the plaintiff. When the plaintiff sued

under Montana's UTPA, State Farm argued it had a reasonable basis in law for

contesting the claim. *Id.* at 422–23.

The Montana Supreme Court agreed with State Farm because Montana's

precedent and the legal landscape across numerous jurisdictions gave credence to

State Farm's decision. *Id.* at 419. Though the Montana Supreme Court found that

State Farm's interpretation of the "Each Person" provision was ultimately incorrect,

the interpretation was reasonable, nonetheless. *Id.* at 421. "Ultimately, the test is

not whether Defendants' position was 'correct' but whether, at the time the defense

was proffered, it was a reasonable interpretation of the law." *Cranska v. UMIA Ins.,*

*Inc.,* 709 F. Supp. 3d 1200, 1210 (D. Mont. 2024) (citing *Freyer*, 312 F.3d at 421).

Unlike State Farm, "UMIA's reasonable basis defense is not grounded on its

interpretation of legal precedent in its coverage determination." (Doc. 121 at 16).

Unlike State Farm, UMIA fails to demonstrate how it relied on legal precedent to

deny Plaintiffs' Underlying Claims. Without this legal basis, UMIA's argument

rests on the assumption that it is appropriate for the Court to determine whether

UMIA's Policies' coverage exclusions applied based on triable facts regarding the Underlying Claims. This determination is not appropriate for summary judgment.

In addition to the facts UMIA proffered for its reasonable basis defense, Judge Cavan found that (1) Dr. Arguelles reached a civil settlement with the DOJ without admission of liability; (2) UMIA never investigated the fraud allegations; (3) a UMIA Claim Team Leader commented in an email regarding Plaintiffs' civil complaints that she did not "interpret the intentionality language as suggesting criminal behavior," rather it was "clear [the Plaintiffs were] alleging it to support their punitive damages claim;" and (4) after mediation with Judge Moses, UMIA reported to its reinsurer that the "alleged violation[s] of federal law which are currently under investigation are not at the state where coverage is impacted." (Doc. 82-1 at 27, 32, 48–56, 57–64). After reviewing the record, fraud and violation of law remains a disputed issue. Thus, whether Dr. Arguelles was covered under UMIA's Policies remains a disputed issue.

Like in its Motion for Summary Judgment, UMIA utilizes disputed facts, not legal precedent, to defend against Plaintiffs' UTPA claims. *See Palmer by Diacon v. Farmers Ins. Exch.*, 861 P.2d 895, 899–903 (1993) (holding that whether the insurer had a reasonable basis to deny an underlying claim was a question of fact where there were disputed facts as to how the insured's accident occurred, and thus,

whether there was coverage under the policy). As Judge Cavan correctly found, this determination is for the trier-of-fact and is inappropriate for summary judgment.

For theses reasons, the Court adopts Judge Cavan's findings as to whether Plaintiffs' Underlying Claims were excluded from UMIA's policy coverage under the fraud or violation of law exclusions.

### c. Whether UMIA had a Reasonable Basis to Contest Plaintiffs' Damages as to the Underlying Claims

Third, as to the amount attributed to the Plaintiffs' Underlying Claims, UMIA argues that Montana law limits non-economic damages to $250,000. (Doc 123 at 9 (citing Mont. Code Ann. § 25-9-411)). Additionally, UMIA argues that under Montana law, a plaintiff in a medical malpractice action may not recover medical expenses when the plaintiff does not actually incur those costs. (*Id.* (citing *Gibson v. United States*, 499 P.3d 1165, 1171 (Mont. 2021)). *Gibson* was decided in December 2021, after Plaintiffs settled the Underlying Claims against Dr. Arguelles. Thus, UMIA would not have relied on *Gibson* at the time of pre-mediation settlement and it does not represent the relevant legal landscape during the Underlying Claims.

UMIA further cites to *Gibson v. United States*, CV-18-112-GF, 2020 WL 1677585, at *9–10 (D. Mont. Apr. 6, 2020) and *Willink v. Boyne USA, Inc.*, CV 12-74-BU, 2013 WL 5756157, at *2 (D. Mont. Oct. 23, 2013), to demonstrate that Montana law limits medical expenses recovery to an amount actually paid. UMIA

argues that based on relevant legal precedent, Fryer's and Davison's maximum recovery "based on information known at the time of the pre-suit mediation — was $300,000 and $250,000, respectively." (Doc. 123 at 9–10). Thus, UMIA concludes that the $250,000 it paid to each Plaintiff was objectively reasonable as a matter of law.

Here, UMIA misapplies the reasonable basis test. The test is not whether UMIA's payment was reasonable. Rather, the test is whether the insurer had a reasonable basis in law for contesting the amount of the claim. Mont. Code. Ann. § 33-18-242(6). UMIA is correct that under Montana law, non-economic damages in medical malpractice cases are capped at $250,000 per injury, regardless of whether the malpractice claim is based on a single act or a series of acts by one or more healthcare providers. § 25-9-411(1)(a). Because the statutory cap was in effect at the time Plaintiffs filed the Underlying Claims, UMIA had a reasonable basis in law that the amount of non-economic damages was limited to $250,000. Plaintiffs were apparently aware of the cap on non-economic damages because they indicated so in their demand letters. (Doc. 74-1 at 800–01, 859). When calculating the settlement demand, Plaintiffs listed non-economic damages as "**$250,000** to $1,000,000." (*Id.* (emphasis in the original)). Regarding the $1,000,000, Plaintiffs indicated they would challenge the damages cap, presumably at trial. In Montana, the $250,000 limit "may not be disclosed to a jury," which means a plaintiff may request non-

24

economic damages exceeding the statutory cap at trial. Mont. Code Ann. § 25-9-411(4). Generally, the court will apply the statutory cap after the jury verdict.

Here, Plaintiffs included only $250,000 in the total settlement demand. Regardless of whether Plaintiffs would have sought higher damages at trial, Plaintiffs recognized and requested the maximum amount for non-economic damages. Thus, there was no reason to contest that amount as exceeding the statutory limit. Accordingly, UMIA did not have a reasonable basis in law to contest the amount of non-economic damages because Plaintiffs' request was within the statutory cap.

As for economic damages, proper damages in a non-contract action "is the amount which will compensate for all the detriment proximately caused . . . whether it could have been anticipated or not." § 27-1-317. Regarding medical expenses, UMIA is correct that medical expenses are limited to amounts actually paid. *See Gibson*, 2020 WL 1677585 at *9–10; *Willink*, 2013 WL 5756157 at *2. At the time of mediation, the parties disputed compensation and causation. Consequently, the parties never determined how much of the medical bills were proximately caused by Dr. Arguelles' alleged misconduct even though the law would have limited medical expenses recovery to an amount paid.

UMIA argues that Fryer's and Davison's maximum recovery "based on information known at the time of the pre-suit mediation — was $300,000 and

$250,000, respectively." UMIA assumes this "reasonable" payment means that medical expenses would have been limited to Plaintiffs' medical liens. However, Plaintiffs' itemized costs exceeded their medical liens in their 2019 settlement demand. (Docs. 74-1 at 800, 859). Plaintiffs' demands for medical bill recovery presumably stemmed from Dr. Arguelles' treatment. Davison's demand included: (1) cost for unnecessary Remicade treatment—$265,200; (2) medical bills for ICU admission—$136,808; (3) medical bills from New Hope—$11,541; and (4) lost wages—$201,520. (Doc. 74-1 at 833). Davison's medical lien totaled $0. (Doc. 74-1 at 1200). Fryer's demand included: (1) cost for unnecessary Remicade treatment—$567,041; (2) out of pocket expenses—$37,700; and (3) travel expenses—$6,300. (*Id.* at 859). Fryer's medical lien totaled approximately $50,000. (*Id.*). Alternatively, UMIA's internal assessment estimated economic damages at $700,000 for Fryer and $652,068–$650,548 for Davison. (*Id.* at 1139, 1150). Further, UMIA asserted and continues to assert that had the case gone to trial, it would have disputed causation. For example, Kalkstein stated that he would have investigated whether Dr. Arguelles' treatment caused Davison's hospitalization. (*Id.* at 187).

In sum, causation was a disputed issue at the time of pre-suit mediation. Therefore, UMIA did not have a reasonable basis in law to contest the amount of the Underlying Claims because there were triable facts as to how much of the medical

bills were caused by Dr. Arguelles. Though Plaintiffs ultimately settled the Underlying Claims, UMIA's argument rests on the assumption that it is appropriate for the Court to determine that Plaintiffs' medical costs were limited to their medical liens. This would require the Court to engage in a factual analysis which is inappropriate for summary judgment under Montana's test for a reasonable basis in law.

For these reasons, the Court adopts Judge Cavan's findings as to whether UMIA had a reasonable basis to contest Plaintiffs' damages as to the Underlying Claims.

### 2.    Plaintiffs' Objection Regarding Reasonably Clear Liability

Next, Plaintiffs argued in their Motion for Partial Summary Judgment that the undisputed facts demonstrate UMIA's reasonably clear liability with respect to Plaintiffs' Underlying Claims and thus, the Court should make an initial determination accordingly. (Doc. 78).

It is unlawful for an insurer to "neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Mont. Code Ann. § 33-18-201(6). Pursuant to the plain statutory language, the claim requires an initial determination of whether UMIA's liability was reasonably clear with respect to Plaintiffs' Underlying Claims. This

determination is typically one for the trier-of-fact. *See Dean v. Austin Mut. Ins. Co*, 869 P.2d 256, 258 (Mont. 1994); *Redies*, 150 P.3d at 944.

Judge Cavan found there were genuine issues of material fact regarding whether liability was reasonably clear. (Doc. 121 at 17–18). He denied both parties' motions—UMIA's defense that liability was not reasonably clear and Plaintiffs' argument that it was. Judge Cavan highlighted several disputed facts including contradictory evidence that Dr. Arguelles testified to providing appropriate care while conceding liability in a phone call. (*Id.* at 17). Additionally, Reserve Reports from January and June 2020 noted that every expert UMIA consulted found Dr. Arguelles failed to comply with the standard of care and now, Dr. Arguelles denies ever admitting liability. (*Id.*). Plaintiffs object to Judge Cavan's findings.

Plaintiffs argue there is "overwhelming and uncontradicted evidence of liability, causation and damages" for a reasonable juror to find "reasonably clear" liability. (Doc. 124 at 10). For example, UMIA's medical experts confirmed that Dr. Arguelles breached the standard of care and Dr. Arguelles "conceded his malpractice" on a phone call with UMIA's counsel. (*Id.* at 9). Plaintiffs proffer an email from UMIA Claim Team Leader Cathy Larson to bolster their argument. Larson wrote to UMIA's Chief Legal Officer and Senior Vice President of Insurance Operations: "Expert reviews extremely negative. Montana rheumatologist found Arguelles' care egregious, claiming that he made the wrong diagnosis, not

28

predicated on evidence based medicine and that the course of treatment was a significant departure from the standard of care." (*Id.* at 9 (citing Doc. 77-1 at 101)).

In response, UMIA introduces competing facts to rebut Plaintiffs' argument. Particularly relevant, UMIA shows that: (1) Dr. Arguelles disputed liability at the time of settlement and continues to dispute liability; (2) Dr. Arguelles testified that he does not recall a phone conversation where he conceded malpractice and further, did not give any attorney authority to admit liability; (3) Dr. Arguelles prevailed on three of the five cases brought to MMLP; and (4) Kalkstein informed UMIA that if the cases did not settle, he would investigate the case regarding causation. (Doc. 127 at 9 (citing Doc. 74-1 at 20, 22, 78, 187, 192)).

Here, the Court agrees with Judge Cavan's finding that determining whether liability was reasonably clear is a question for the jury. The parties' reliance on triable facts demonstrates that factual disputes affecting coverage remain. And "[f]actual disputes affecting coverage are certainly decided by the trier of fact." *Freyer*, 312 P.3d at 422. "The Court may weigh evidence and determine that one party's position is more compelling, but that is not the Court's role on summary judgment." (Doc. 121 at 18). Moreover, if the Court determined that liability was reasonably clear, it would necessarily require the Court to determine that UMIA had a reasonable basis in fact to contest Plaintiffs' claims. However, as already

explained, this determination is improper for summary judgment when there are disputed facts as to the Underlying Claims.

For these reasons, the Court adopts Judge Cavan's findings and denies Plaintiffs Partial Motion for Summary Judgment re: "Clear Liability." (Doc. 76).

### 3. Plaintiffs' Objection Regarding UMIA's Defense: Fraud and Violation of Law

As analyzed above, UMIA pleads that it "had reasonable bases both in law and in fact for contesting Plaintiffs' claims and the amount of Plaintiffs' claims pursuant to Mont. Code Ann. § 33-18-245(5)." (Doc. 2 at 11). UMIA argues that it had a reasonable basis for contesting Plaintiffs' claims because its Policies did not cover Dr. Arguelles' conduct. According to the UMIA Policies, they do not cover claims resulting from a violation of law or fraudulent conduct. UMIA alleges that coverage of Plaintiffs' malpractice claims did not apply because UMIA had reason to believe that Dr. Arguelles was violating the law or committing fraud.

Plaintiffs argue that the Court should dismiss UMIA's affirmative defense on the grounds that UMIA cannot prove fraud or a violation of law. (Docs. 80, 81, 214). Plaintiffs contend that "what Defendants have masqueraded as fraud is only unsubstantiated speculation." (Doc. 124 at 8).

Judge Cavan dismissed Plaintiffs arguments on the grounds that there are triable facts as to whether Dr. Arguelles was violating the law or engaging in fraud. (Doc. 121 at 18–19). Thus, Judge Cavan found there were disputed issues as to

whether Plaintiffs' Underlying Claims were excluded from coverage. (*Id.* at 18). Plaintiffs object to Judge Cavan's determination and allege that he relied on inadmissible evidence, allegations, and otherwise unrelated fraudulent investigations to formulate his findings. (Doc. 124 at 2–8).

Here, the Court finds Plaintiffs argument is misplaced. The legal standard for UMIA's defense is not whether UMIA must prove fraud but whether UMIA had a reasonable basis for disputing Plaintiffs' claims. *See* Mont. Code. Ann. § 33-18-245(5). As explained above, "[a]n insurer asserting this affirmative defense has the burden of establishing it by a preponderance of the evidence." *Redies*, 150 P.3d at 937. Thus, UMIA must establish by a preponderance of the evidence that it had a reasonable basis in law or in fact for contesting Plaintiffs' claims. While the allegation of fraud may form the basis of UMIA's defense that its Policy coverage did not apply, UMIA does not need to prove fraud to assert a reasonable basis defense under the UTPA.

The Court has already established that UMIA did not meet the standard for proving a reasonable basis in law at summary judgment. However, UMIA may still establish that it had a reasonable basis in fact for disputing Plaintiffs' claims. Montana law instructs that a determination made as a matter of fact is a question for the trier-of-fact. *Id.* at 930. Accordingly, the Court finds that Judge Cavan correctly

denied summary judgment. Because this issue is for the trier-of-fact, the Court will not consider Plaintiffs' evidentiary objections to Judge Cavan's findings at this time.

For these reasons, the Court adopts Judge Cavan's findings.

### B. Damages

#### 1. Compensatory Damages

As for damages, UMIA argued in its Summary Judgment Motion that Plaintiffs cannot recover the amounts they already claimed against Dr. Arguelles. (Doc. 121 at 21). "In a UTPA action, recoverable compensatory damages are limited to those that were proximately caused by the violation of § 33-18-201(1), (4), (5), (6), (9), or (13)." Mont. Code Ann. § 33-18-242(2). "Each case must, of necessity, depend on its own peculiar facts." *French v. Ralph E. Moore, Inc.*, 661 P.2d 844, 849 (Mont. 1983). The purpose of compensatory damages "is to redress the concrete loss that a plaintiff has suffered by reason of a defendant's wrongful conduct." *Seltzer v. Morton*, 154 P.3d 561, 600 (Mont. 2007). However, Plaintiffs may seek compensatory damages for their alleged parasitic emotional distress that results from the alleged UTPA violations. *Cranksa*, 709 F. Supp. 3d at 1215. It is also a fundamental principle under Montana law that compensatory damages are intended to "compensate the injured party for actual loss or injury[—]no more, no less." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1088 (Mont. 2007).

Judge Cavan found that the damages in this case should be determined at trial. (Doc. 121 at 23). Under Montana law, Judge Cavan determined that Plaintiffs cannot recover damages solely caused by Dr. Arguelles' care and treatment that are not causally related to UMIA's alleged violations of the UTPA. (*Id.* at 21). Judge Cavan noted that UMIA did not specifically delineate what elements of damages Plaintiffs may be seeking that are not, as a matter of law, causally related to UMIA's conduct. (*Id.* at 21–22). UMIA objects to this finding.

UMIA argues it did delineate damages in its statement of undisputed facts (Doc. 74). UMIA asserts that Plaintiffs are seeking the same amounts they sought against Dr. Arguelles less the $250,000 UMIA paid to each Plaintiff. (Doc. 123 at 4). UMIA concludes that the damages sought against Dr. Arguelles have been compensated for and thus, are not recoverable under the UTPA action. (*Id.*).

Here, the Court agrees with Judge Cavan and UMIA that compensatory damages are limited to damages causally related to UMIA's alleged violations of the UTPA, not Dr. Arguelles' care and treatment. However, at this stage, it is improper for the Court to determine the amounts for which UMIA may be responsible provided numerous triable facts related to causation. Plaintiffs identify the same medical expenses and other costs asserted in the Underlying Claims to prove the value of their malpractice claims. (Doc. 74-1 at 833, 866–67). However, Plaintiffs also request "in the alternative, or in addition" amounts for "physical stress, mental

33

and emotional suffering, distress and anxiety from having to litigate, for nearly five years." (*Id.* at 833, 867). If UMIA wishes to exclude the introduction of medical expenses at trial, it may request to do so in a motion in limine.

However, at this time, the Court will not determine the amount of damages causally related to UMIA's conduct. As the case depends on its own peculiar facts, "[t]he nature and extent of Plaintiffs' damages caused by any such violation should be determined at trial." (Doc. 121 at 23). For these reasons, the Court adopts Judge Cavan's findings and determines that UMIA is not entitled to summary judgment on Plaintiffs' claim for compensatory damages.

### 2. Punitive Damages

UMIA next argues that Plaintiffs are not entitled to punitive damages because "[t]here is nothing in the record to indicate that UMIA acted with actual malice or fraudulently." (Doc. 123 at 11). The Court finds that UMIA did not properly object to Judge Cavan's findings because it did not identify record evidence contradicting his findings and further, did not set forth authority contradicting his recommendation. Therefore, the Court will review Judge Cavan's finding and recommendation for clear error.

Under certain provisions of the UTPA, Montana law allows a party to recover punitive damages when a defendant has committed actual fraud or malice. Mont. Code. Ann. §§ 33-18-242(5), 27-1-221(1).

A defendant is guilty of actual malice if the defendant has knowledge of the facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:

    (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or

    (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

A defendant is guilty of actual fraud if the defendant:

    (a) makes a representation with knowledge of its falsity; or

    (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury.

*Id.* § 27-1-221(2)–(3).

"The statutory language demonstrates that, as with proof of the alleged UTPA violation itself, proof of actual malice depends on what the insurer knew or disregarded when it considered the subject claim." *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 206 (Mont. 2008). The determination of whether punitive damages are warranted is typically left to the jury because of the fact intensive analysis. "Courts should therefore deny summary judgment if a reasonable juror could determine clear and convincing evidence exists in the record to support a finding of actual fraud or actual malice." *Byroth v. USAA Cas. Ins. Co.*, CV 17-153, 2020 WL 5232485, at *1 (D. Mont. Sept. 2, 2020). During summary judgment, Plaintiffs are not required to prove that UMIA's actions constituted actual malice, but rather that a genuine

dispute exists with regard to this allegation. *See Hagen v. Dow Chemical Co.*, 863 P.2d 413, 420 (Mont. 1993).

Judge Cavan found that summary judgment was inappropriate because there are disputed facts as to whether liability was reasonably clear, whether the Policies' fraud and violation of law exclusions applied, whether damages were owed, and if so, how much. Judge Cavan also found clear and convincing evidence as to actual malice including: (1) UMIA's awareness as early as 2018 that no expert supported Dr. Arguelles' standard of care practice; (2) UMIA's report that there was less than a 10% global chance of a successful defense; and (3) UMIA's records indicating that Plaintiff's damages exceeded the $250,000 settlement UMIA ultimately offered. (Doc. 121 at 25).

UMIA broadly objects to Judge Cavan's finding. It states that it engaged in pre-suit mediation knowing that coverage issues were in dispute and Dr. Arguelles maintained his innocence. For those reasons, UMIA states it "offered the maximum amount justifiable based on the damages information in its possession." (Doc. 123 at 11).

UMIA sets forth no authority to contradict Judge Cavan's recommendation and otherwise fails to contradict Judge Cavan's finding. For these reasons, the Court finds no error in Judge Cavan's reasoning and adopts his findings as to punitive damages.

## IV.    Conclusion

IT IS SO ORDERED that Judge Cavan's Findings and Recommendations (Doc. 121) are ADOPTED in full.

IT IS FURTHER ORDERED that:

1.    UMIA's Motion for Summary Judgment (Doc. 73) is DENIED;

2.    Plaintiffs' Motion for Partial Summary Judgment Re: "reasonably clear liability" (Doc. 76) is DENIED; and

3.    Plaintiffs' Motion for Partial Summary Judgment as to Defendants' Seventh Affirmative Defense: "fraud" or "violation of law" (Doc. 80) is DENIED.

DATED this ___3rd___ day of March, 2025.

SUSAN P. WATTERS
United States District Judge