IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DONNA FRYER and BARBARA DAVISON,<br><br>Plaintiffs,<br><br>vs.<br><br>UMIA, an insurance company, and CONSTELLATION, INC., a mutual insurance holding company, doing business as "Constellation®",<br><br>Defendants. | CV 22-14-BLG-SPW<br><br>ORDER ON PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE JOHN SULLIVAN |

Before the Court is Plaintiffs' Motion to Preclude in Limine John Sullivan (Doc. 198). Defendants UMIA and Constellation, Inc. (collectively "UMIA") oppose the Motion. (Doc. 202). For the following reasons, the Motion is denied in part and reserved for ruling in part.

I.  **Background**

In July 2025, UMIA's retained expert, William Mercer, was nominated to the federal bench for the District of Montana. As such, the Court granted UMIA's motion to modify the scheduling order, allowing UMIA to designate a new Department of Justice ("DOJ") expert to replace Mr. Mercer. (Doc. 163).

UMIA designated attorney John Sullivan of Holland & Hart LLP. (*See* Doc. 199-1). Plaintiffs' counsel deposed Mr. Sullivan on October 8, 2025. (Doc. 199-3).

1

Plaintiffs now seek a Court order precluding Mr. Sullivan from testifying at trial, arguing that Sullivan: (1) has no personal knowledge of the DOJ's investigation into Dr. Enrico Arguelles; (2) is not a properly qualified expert; (3) is not reliable and will not assist the trier of fact; (4) bases his opinions on inadmissible "after-acquired" evidence; and (5) offers prejudicial and confusing opinions. (Doc. 199 at 2).

## II. Legal Standard

A motion in limine is used to preclude prejudicial or objectionable evidence before it is presented to the jury. *Agan v. BNSF Ry.*, CV 19-83-BLG, 2022 WL 3700052, at *1 (D. Mont. Aug. 26, 2022). The Court shall exclude evidence in limine only if the evidence is inadmissible on all potential grounds. *Id.* Unless evidence meets this high standard, the Court shall defer evidentiary rulings until trial so that questions of foundation, relevancy, and potential prejudice are resolved in proper context. *Id.* "A motion in limine should not be used to resolve factual disputes or weigh evidence." *BNSF Ry. v. Quad City Testing Lab'y, Inc.*, CV-07-170-BLG, 2010 WL 4337827, at *1 (D. Mont. Oct. 26, 2010).

Motions in limine must specifically "identify the evidence at issue and state with specificity why such evidence is inadmissible." *Colton Crane Co. v. Terex Cranes Wilmington, Inc.*, 2010 WL 2035800, at *1 (C.D. Cal. May 19, 2010). "Orders in limine which exclude broad categories of evidence should rarely be

2

employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

The decision on a motion in limine is consigned to the district court's discretion—including the decision of whether to rule before trial at all. *United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999). Rulings on motions in limine are provisional, and the trial judge may always change their mind during trial. *Luce v. United States*, 469 U.S. 38, 41 (1984).

## III. Discussion

### A. *Personal Knowledge*

Plaintiffs first argue that Mr. Sullivan should be precluded from testifying as a lay witness under Federal Rule of Evidence 602 because he lacks personal knowledge of the DOJ's investigation into Dr. Arguelles. (Doc. 199 at 14). While it is generally true that a witness may not testify unless there is sufficient evidence demonstrating their personal knowledge of the matter, experts are exempt from the personal knowledge requirement.[1] Fed. R. Evid. 602 ("This rule does not apply to a witness's expert testimony under Rule 703.").

---

[1] Plaintiffs do not point to record evidence demonstrating Defendants' designation of Mr. Sullivan as a hybrid witness, and the Court is unaware of such a designation.

The Court denies Plaintiffs' Motion to exclude Mr. Sullivan's "commentary" on the basis that he lacks personal knowledge because Rule 602 does not apply to his expert testimony. (*See* Doc. 199 at 14).

B.   *Expert Qualifications, Subject Matter to Assist the Jury, and Reliability*

Plaintiffs next seek to exclude Mr. Sullivan's testimony under Federal Rule of Evidence 702, arguing he is not qualified as an expert, lacks knowledge to assist the trier of fact, and is otherwise unreliable. (Doc. 199 at 14–19). The Court disagrees.

District courts are the "gatekeepers" to determine the admissibility of expert opinion testimony. Fed. R. Evid. 702. Expert testimony may not be admitted unless the proponent demonstrates the testimony meets the requirements set out in Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"One of the preliminary gate-keeping determinations a trial court must make relative to the admission of an expert's testimony is whether the witness is appropriately qualified as an expert on the particular subject matter." *Hardesty v.*

4

*Barcus*, CV 11-103-M, 2012 WL 5906797, at *2 (D. Mont. Nov. 26, 2012). If the expert is not qualified, the testimony must be excluded.

If the expert is deemed qualified, the next inquiry is whether the expert's testimony will assist the trier of fact. This inquiry embraces a wide variety of subjects and hinges on the relevance of the testimony. *See, e.g., Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 897–98 (9th Cir. 1993) (helpful and necessary expert testimony as to whether the release of fumes was caused by a fire or chemical reaction); *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 807–11 (11th Cir. 2017) (helpful and necessary expert testimony about police practices in a case alleging excessive-use-of force); *Tekoh v. County of Los Angeles*, 75 F.4th 1264, 1265–66 (9th Cir. 2023) (helpful and necessary testimony about how coercive interrogation techniques can lead to false confessions).

If the subject matter will assist the trier of fact, the Court must then determine whether the testimony is reliable. "To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable—an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). This gatekeeping function applies to all expert opinion testimony, not just to testimony of a scientific nature. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).

5

In sum, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (citation modified).

### 1. Qualifications

Plaintiffs first attack Mr. Sullivan's qualifications, arguing he has no professional experience prosecuting healthcare fraud claims, handling medical malpractice cases, litigating declaratory judgment actions, or interpreting insurance policies, which are relevant to the case. (Doc. 199 at 3–5, 15).

There are no definite guidelines for determining the knowledge, skill, or experience required either in a particular case or of a particular witness. "The test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702—knowledge, skill, experience, training, or education." *Santos v. Posadas de Puerto Rico Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006).

After law school, Mr. Sullivan worked as a law clerk for the Honorable Sam E. Haddon of the United States District Court for the District of Montana. (Doc. 199-2). He then worked as an Assistant U.S. Attorney ("AUSA")—in the same office that investigated Dr. Arguelles both criminally and civilly—for four years in

6

the criminal division. (Doc. 199-3 at 5). For the last seven years, Mr. Sullivan's practice has involved defending healthcare providers against government investigation into suspected healthcare fraud. (Doc. 199-1 at 2; Doc. 199-2). His expertise includes investigations related to healthcare and financial fraud, the False Claims Act, the Controlled Substances Act, and environmental laws. (Doc. 199-2).

Mr. Sullivan's expected trial testimony will explain and contextualize the DOJ's investigation of Dr. Arguelles. Mr. Sullivan will opine on how the facts known to UMIA could support a reasonable belief that Dr. Arguelles committed fraud or violated the law. (Doc. 202 at 4, 5, 7–9, 11, 12). He plans to provide expert insight into how DOJ investigations are generally conducted, including what level of evidence is necessary for the government to seek a search warrant, and DOJ decision-making processes regarding whether to pursue matters as criminal or civil cases. (*Id.* at 5; Doc. 199-1 at 9–11).

Here, the combination of Mr. Sullivan's prosecutorial experience (as a DOJ attorney) and defense experience (representing healthcare providers/entities in government investigations) qualifies him to offer opinions about DOJ investigations and the reasoning behind them.

Moreover, Mr. Sullivan's experience is relevant to the scope of his testimony. He will not offer an opinion on the viability of the underlying medical malpractice claims, or justify UMIA's declaratory judgment action, or provide expert opinions

7

on insurance coverage law. (Doc. 202 at 7). His opinion is related to the foundational facts surrounding the DOJ investigations and Plaintiffs' initial lawsuits. Based on his experience, Mr. Sullivan is qualified to provide such an opinion.

### 2. *Subject Matter to Assist the Jury*

Plaintiffs next argue that Mr. Sullivan's opinions "about the federal method of collecting documents via search warrants and subpoenas has no relation to advancing a material aspect of this bad faith case," and will not assist the trier of fact. (Doc. 199 at 16).

Expert testimony is admissible if it concerns "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(b). "Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002).

Here, whether UMIA had a reasonable basis to contest coverage remains a factual issue for the jury. Mr. Sullivan's testimony will help explain and contextualize the DOJ's investigation to support UMIA's defense—that it had a reasonable basis to contest coverage. The "federal method" of collecting documents by search warrants and subpoenas is part of that contextualization. Search warrants and subpoenas give meaning to an investigation and that meaning—if known to UMIA at the time—would likely have influenced UMIA's actions while adjusting

Plaintiffs' claims. Mr. Sullivan's opinions are therefore relevant and will assist the jury in determining whether UMIA had a reasonable basis to contest coverage.

### 3. *Reliability*

Finally, Plaintiffs challenge Mr. Sullivan's reliability on the grounds that: (1) he is unsure if the underlying information—which forms the bases of his opinions—was available to UMIA during the claims-adjustment period;[2] (2) he has no expertise in the insurance industry; and (3) he makes unauthorized legal conclusions.[3] (Doc. 199 at 17). On a separate basis to strike his testimony, Plaintiffs assert Mr. Sullivan's opinions are "identical" and "substantially similar" to the opinions offered by his predecessor, Mr. Mercer. (*Id.* at 18).

The reliability determination has three components: (1) the expert must base the opinion "on sufficient facts or data"; (2) the expert must ground the opinion in "reliable principles and methods"; and (3) the expert's opinion must reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). When non-scientific expert testimony is proffered, "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

---

[2] The Court addresses Plaintiffs' challenge in its analysis on after-acquired evidence.
[3] The Court has already ruled that experts may not express an opinion on a conclusion of law but may testify to ultimate issues of fact. (Doc. 168 at 15–16). Mr. Sullivan is bound by the Court's ruling.

9

Here, Mr. Sullivan's knowledge and experience make his opinions sufficiently reliable. The Court examined Mr. Sullivan's experience above and reintegrates those findings here. His opinions provide the legal backdrop for the DOJ's investigations into Dr. Arguelles and Plaintiffs' initial lawsuits. With four years of prosecutorial experience as an AUSA and seven years of experience defending healthcare providers and entities in DOJ/government fraud investigations, Mr. Sullivan has demonstrated the requisite knowledge and experience to provide such an opinion.

Further, the Court will not exclude Mr. Sullivan's opinions against Plaintiffs' allegations that he "simply adopt[ed]" Mr. Mercer's report. (*See* Doc. 199 at 18). According to Mr. Sullivan, he "read [Mr. Mercer's] report initially, but then . . . conducted [his] own investigation, reviewed the materials, and prepared [his] own opinion." (Doc. 199-3 at 4). Though Plaintiffs tell the Court that the two opinions are "identical" and "substantially similar," Plaintiffs fail to show the Court where these similarities exist. (*See* Doc. 199 at 18).

For the foregoing reasons, the Court denies Plaintiffs' Motion to exclude Mr. Sullivan's testimony under Federal Rule of Evidence 702.

C. *After-Acquired Documents and Evidence*

Plaintiffs next argue that Mr. Sullivan's opinions are based on after-acquired documents and evidence, making his opinions and the underlying information

10

inadmissible. (Doc. 199 at 19). Plaintiffs seek to exclude Mr. Sullivan from relying on six documents he reviewed and related facts he considered to prepare his report, arguing that none of the identified information was available to UMIA when it adjusted Plaintiffs' claims. (*Id.* at 6–12). The documents include:

(1) the search warrant application, affidavit in support, and related filings in Case No. MJ-17-27-BLG-TJC;

(2) a letter from Stewart Kirkpatrick to Montana Board of Medical Examiners, dated June 6, 2019;

(3) attorney materials prepared by Davis Wright Tremaine LLP for U.S. Attorney's Office for the District of Montana, dated December 4, 2017 and April 27, 2020;

(4) a letter from AUSA Michael Kakuk to Davis Wright Tremaine LLP counsel, dated March 3, 2021;

(5) the settlement agreement between DOJ and the Arthritis and Osteoporosis Center ("AOC") and Dr. Arguelles, dated July 14, 2021;

(6) the HHS Office of Inspector General investigative memoranda, dated May 18, 2017–September 21, 2021

(Doc. 199-1 at 3–4).

The facts include:

(1) information regarding HHS OIG Special Agent Kelsi Larsen's application for a search warrant for AOC on March 29, 2017, relating to potential violations of 18 U.S.C. §§ 286, 287, 1343, 1347, and 1035;

(2) information that Judge Timothy J. Cavan unsealed in part the government's search warrant application and ordered the government to provide a redacted version of the search warrant affidavit to Dr. Arguelles on November 23, 2020;

11

    (3) information contained in the search warrant affidavit including:

        a. allegations of fraud against Dr. Arguelles under Title 18, including conspiracy to defraud the government with respect to false claims, false fictitious or fraudulent claims, false statements related to health care matters, wire fraud, and healthcare fraud;

        b. details of the federal investigation of Dr. Arguelles, starting in April 2024 when he was identified as the highest paid Medicare physician in Montana, that he was ranked number one in charges billed to Medicare in a comparison against his peers in a 14-state region, and that his total Medicare reimbursement for 2012 exceeded the median reimbursement for rheumatologists by more than 40 times;

        c. information regarding the U.S. Attorney's Office contract with Medical Review Institute of America in September 2015, to provide an external peer review of the records obtained from the AOC. That review identified a number of issues, including duplicate billing, undocumented procedures bills to Medicare, unbundling or overbilling, medically unnecessary imaging, and many others; and

        d. witness interviews, including of a rheumatologist in Montana who had been "bombarded" with former patients of Dr. Arguelles who were diagnosed with diseases "that they did not actually have," of former employees of AOC who expressed concerns about upcoding, excessive MRIs, and insufficient medical documentation to support charges, and former patients who described their medical treatment by Dr. Arguelles;

    (4) information that while the search warrant executed on AOC in 2017 pertained to a criminal investigation, the government pursued a civil investigation of Dr. Arguelles and AOC under FCA. AUSA Kakuk alleged Dr. Arguelles misdiagnosed patients, made false statements in his patient notes, routinely upcoded MRIs, unbundled claims for infusing billing, and generally engaged in fraudulent overbilling. Kakuk explained that the government "had ample evidence to prove that Dr. Arguelles knew the falsity of the claims he submitted to Medicare, or at the very least that he demonstrated a reckless disregard for the truth of those claims," resulting in what the government believed were at least $1.6 million in single damages based on Dr. Arguelles's conduct;

(5) information that Dr. Arguelles and AOC resolved the FCA allegations with DOJ on July 14, 2021. The government contended that Dr. Arguelles violated the FCA between January 1, 2015 and September 2018. Dr. Arguelles did not admit any liability but settled with the government for $2,070,664.76, of which $1,035,332 was characterized as restitution; and

(6) information that following settlement between Dr. Arguelles/AOC and the government, the U.S. Attorney's Office issued a press release on July 21, 2021, stating that the settlement "resolves claims of improper medical treatments and false billing to a federal program" and over billed and unnecessary claims.

(*Id.* at 6–7).

The Court has already determined that under Montana law, operative facts of Plaintiffs' underlying medical malpractice claims, and the information available to UMIA during the adjustment process, are probative to the merits of the UTPA claim. (Doc. 169 at 5; Doc. 133 at 5). This means that the "insurer['s] conduct [must] be retrospectively measured against the standards adopted by the Legislature in enacting the UTPA," and those "UTPA standards focus on what the insurer kn[ew] at a particular point in time—before trial, during the investigative settlement stage." *Graf v. Cont'l W. Ins.*, 89 P.3d 22, 27 (Mont. 2004). Thus, the information in an insurer's record is critical in determining whether a UTPA violation occurred. *Lorang v. Fortis Ins.*, 192 P.3d 186, 204 (Mont. 2008).

At the same time, under Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." The underlying data need not be admissible for an expert to

rely on it. However, if an expert seeks to base an opinion on facts neither perceived by him personally nor introduced into evidence, the district court must determine, pursuant to Rule 104(a), that such reliance is reasonable. For example, in *Charrizosa v. Chiquita Brands International, Inc.*, the district court did not allow expert testimony by one of plaintiffs' experts that paramilitary organizations had murdered plaintiffs' relatives. 47 F.4th 1278, 1322–23 (11th Cir. 2022). The opinion was based partially on counsel's statement that "over 90% of the [2,000] cases he investigated were committed by the paramilitaries." *Id.* at 1321. The Eleventh Circuit affirmed, concluding: "The hearsay statement of counsel, absent independent investigation or verification, is not the type of evidence on which an expert . . . would reasonably rely to form an opinion." *Id.* at 1323.

Here, Mr. Sullivan's expert opinions—like other expert opinions in this case—are only reasonably reliable if based on information UMIA knew at the time of the claims-adjustment process. In other words, Mr. Sullivan's opinions are probative only if his opinions are based on the operative facts of the underlying claims and the information available to UMIA during the investigative settlement stage. Otherwise, his opinions risk misleading the jury into misusing inappropriate evidence for substantive purposes.

Mr. Sullivan is not aware whether UMIA had knowledge of or received the information Plaintiffs identify as after-acquired evidence. (Doc. 199-3 at 16, 17, 18,

14

19, 22). Indeed, UMIA has never disclosed to the Court exactly what it knew about the DOJ investigation at the time it adjusted Plaintiffs' claims. Similarly, in response to the instant Motion, UMIA does not indicate which of the documents or facts Mr. Sullivan reviewed were the same material UMIA relied on during the claims-adjustment period. UMIA argues instead that Mr. Sullivan's opinion is primarily based on four items, three of which were in UMIA's possession at the relevant time: (1) the issuance of subpoenas on Dr. Arguelles and AOC; (2) the execution of a search warrant on AOC; (3) Plaintiffs' allegations in their initial pleadings; and (4) Dr. Arguelles's settlement with the DOJ. This response, however, does provide the Court with the necessary proof to rule on whether the after-acquired evidence identified by Plaintiffs is reasonably reliable or admissible.

Accordingly, the Court reserves its ruling on the admission of the identified after-acquired information pending proof, through testimony or other evidence, as to when UMIA possessed the documents or knew about the underlying facts.

D.   *Confusing and Prejudicial Opinions*

In closing, Plaintiffs argue Mr. Sullivan's testimony will be confusing and prejudicial because it contradicts UMIA's claims file and will mislead the jury. (Doc. 199 at 20).

To be admissible, evidence must be relevant under Federal Rule of Evidence 402 and its probative value must not be substantially outweighed by the danger of misleading the jury under Federal Rule of Evidence 403.

The Court has determined Mr. Sullivan's testimony is probative—absent a ruling on the after-acquired information—and further finds that his testimony will not risk confusing the jury if it is tethered to information known to UMIA during the claims-adjustment period. The Court denies Plaintiffs' Motion on this ground.

## IV. Conclusion

IT IS HEREBY ORDERED that Plaintiffs' Motion to Preclude in Limine John Sullivan (Doc. 198) is DENIED in part and RESERVED FOR RULING in part.

DATED this 27th day of October, 2025.

/s/ Susan P. Watters
SUSAN P. WATTERS
United States District Judge