IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DONNA FRYER and BARBARA DAVISON, <br><br> Plaintiffs, <br><br> vs. <br><br> UMIA, an insurance company, and CONSTELLATION, INC., a mutual insurance holding company, doing business as "Constellation®", <br><br> Defendants. | CV 22-14-BLG-SPW <br><br><br> ORDER ON DEFENDANTS' POST-VERDICT MOTIONS AND PLAINTIFFS' MOTION TO STRIKE/DISREGARD NEW EVIDENCE |

Plaintiffs Donna Fryer and Barbara Davison filed a Complaint against Defendants UMIA and Constellation, Inc. (collectively "UMIA"), alleging violations of the Montana Unfair Trade Practices Act ("UTPA").[1] (Doc. 1-4). Trial commenced on November 3, 2025, and the jury rendered a verdict six days later, awarding Plaintiffs $15 million.

UMIA filed its Post-Verdict Motions (Doc. 301) on December 9, 2025, asking the Court to do one of the following: (1) enter judgment in its favor, notwithstanding the verdict; (2) order a new trial; or (3) stay the execution of judgment pending appeal without requiring a bond. (Doc. 302 at 36). Plaintiffs oppose the Motions, filing a response (Doc. 309) and a Motion to Strike/Disregard New Evidence (Doc.

---

[1] Plaintiffs voluntarily dismissed their claim for abuse of process. (Doc. 27).

315). The Motions are fully briefed and ripe for the Court's review. (*See* Docs. 302, 309, 314, 315, 317, 318).

For the following reasons, the Court grants Plaintiffs' Motion to Strike/Disregard New Evidence and denies UMIA's Post-Verdict Motions.

## I.    Background

The Court and the parties are familiar with the facts of this case, so the Court provides only a brief overview here. Plaintiffs were patients of Dr. Enrico Arguelles at his clinic, the Arthritis & Osteoporosis Center (the "AOC"), in Billings, Montana in 2009 (Fryer) and 2014 (Davison). Dr. Arguelles diagnosed and treated each Plaintiff for seronegative rheumatoid arthritis—a condition they later discovered they did not have. After submitting claims with the Montana Medical Legal Panel ("MMLP"), Plaintiffs separately filed medical malpractice claims in state court against Dr. Arguelles and the AOC. The claims were ultimately turned over to UMIA—Dr. Arguelles and the AOC's insurance company—for handling. During UMIA's claims investigation, UMIA learned about Dr. Arguelles's potentially fraudulent conduct through various reports, allegations, and expert medical testimony. Notably, Plaintiffs later amended their state court medical malpractice complaints against Dr. Arguelles and the AOC to allege fraud. (Doc. 281-1 at 1–13, 182–93). Those cases never went to trial, and UMIA ultimately settled Plaintiffs'

2

claims against Dr. Arguelles and the AOC (the "Underlying Claims" or "Claims") in 2021.

At trial, Plaintiffs sought damages arising from the three-to-four-year period UMIA took to settle the Underlying Claims, alleging that such delay amounted to an unreasonable claims-handling practice under Montana's UTPA. UMIA defended the action on the ground that it had a reasonable basis to dispute the Underlying Claims and their coverage—an argument that, if accepted by the jury, would have absolved UMIA of liability.

The jury returned a verdict on November 10, 2025, finding that UMIA had violated the UTPA, and awarded each Plaintiff $3 million in compensatory damages. (Doc. 267). The jury also found UMIA liable for actual malice or actual fraud for its handling of the Underlying Claims. (*Id.*). The Court conducted a separate hearing pursuant to Montana law, after which the jury awarded each Plaintiff $4.5 million in punitive damages. (Doc. 268).

## II.   Discussion

UMIA timely filed 11 post-verdict motions. (Doc. 301). It submitted three under Federal Rule of Civil Procedure 50(b), seeking entry of judgment in its favor notwithstanding the verdict. (Doc. 302 at 5–12, 18–23). It filed seven under Rule 59(a) requesting that the Court order a new trial on various issues litigated by the parties. (*Id.* at 12–18, 23–34). The final motion, brought under Rule 62(b), seeks a

3

stay of execution of the judgment without the posting of a bond or other security. (*Id.* at 34–36).

Plaintiffs oppose each motion and as an initial matter, move the Court to strike two pieces of evidence (Docs. 314-1–314-2) and argument UMIA raised for the first time in its reply brief. (Doc. 315 at 2–3). The Court agrees with Plaintiffs and will grant their Motion to Strike/Disregard New Evidence. "[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1027 (C.D. Cal. 2018) (citation omitted). "[A] district court may decline to consider new evidence or arguments raised in reply," *id.*, and "should not consider the new evidence without giving the [opposing party] an opportunity to respond," *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (citation omitted).

Here, the Montana Law Week Compilation (the "Compilation") (Doc. 314-1) of all reported Montana state and federal court jury verdicts since 1988 with emotional distress damages exceeding $250,000 was not raised by Plaintiffs in their response brief. Nor does it qualify as unforeseen matter. UMIA could have included the Compilation and Frank Adams's accompanying declaration (Doc. 314-2) in its opening brief. It failed to do so. The Court will therefore disregard the newly disclosed information and the arguments relying on that information in its analysis of UMIA's Post-Verdict Motions.

4

Turning to those Motions, the Court concludes that each must be denied.

*A.    Motions 1, 3, and 4: UMIA's Renewed Motions for Judgment as a Matter of Law*

Federal Rule of Civil Procedure 50(b) motions address the sufficiency of the evidence. *Hamilton v. Wal-Mart Stores, Inc.*, No. 5:17-CV-01415, 2020 WL 2041938, at *2 (C.D. Cal. Feb. 11, 2020). In reviewing such motions, "[a] court may not make credibility determinations or weigh the evidence." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citation modified). Any evidence is viewed in "[a] light most favorable to the nonmoving party." *Id.* A Rule 50(b) motion should further only be granted when "the evidence permits . . . one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). Otherwise, "[t]he verdict will be upheld if it is supported by substantial evidence, 'even if it is also possible to draw a contrary conclusion.'" *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067–68 (9th Cir. 2011) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). The high burden of overturning a jury verdict "recognizes that credibility, inferences, and factfinding are the province of [a] jury, not [a] court." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).

*1.    Motions 1 and 3: UMIA's Reasonable-Basis Defense*

After the close of evidence, UMIA moved for judgment as a matter of law under Rule 50(a), seeking a directed verdict on the grounds that UMIA had a

reasonable basis to dispute coverage of the Underlying Claims. (Docs. 246, 247). The Court denied UMIA's motion, finding there were "too many issues of fact, competing testimony, [and] . . . credibility questions" that the jury should resolve. (Doc. 297 at 6). In an effort to renew its Rule 50(a) motion, UMIA filed Motions 1 and 3 seeking a favorable verdict on the grounds that it had a reasonable basis to dispute the coverage of and damages for the Underlying Claims.

At the outset, the Court must deny Motion 3 because UMIA failed to set forth the same factual grounds in its Rule 50(a) motion (Docs. 246, 247; Doc. 296 at 230–35) that it now raises in its Rule 50(b) motion (Doc. 302 at 18–20). UMIA presently argues that the trial evidence showed it possessed conflicting information about the amounts Plaintiffs sought in the Underlying Claims, giving it a reasonable basis to contest the claimed damages caused by Dr. Arguelles. (*Id.* at 19–20). UMIA had raised this same factual issue at summary judgment; however, it failed to raise it at trial through Rule 50(a). "[A] Rule 50(a) motion is . . . a prerequisite for a Rule 50(b) motion." *Williams v. Gaye*, 895 F.3d 1106, 1135 (9th Cir. 2018). "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961. In some circumstances, an ambiguous or inartfully stated Rule 50(a) motion may suffice for Rule 50(b), but the Court finds no ambiguity in UMIA's prior motion. *Id.* Therefore, because UMIA did not raise the factual issues in its Rule

6

50(a) motion it now asserts in its Rule 50(b) motion, it would be improper for the Court to consider the merits. Fed. R. Civ. P. 50 advisory committee's notes to 1991 amendment ("A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion]."). For these reasons, Motion 3 is denied.

Turning then to Motion 1, UMIA properly renews its argument that the trial evidence showed that UMIA possessed sufficient information about Dr. Arguelles's fraudulent conduct to give it a reasonable basis for disputing coverage of the Underlying Claims. (Doc. 302 at 7–12). However, after reviewing the trial testimony and evidence presented, the Court cannot conclude under Rule 50(b) that the jury lacked a legally sufficient evidentiary basis for its verdict in favor of Plaintiffs. The verdict must therefore be upheld.

In Montana, "[a]n insurer may not be held liable under [the UTPA] if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue." Mont. Code Ann. § 33-18-242(5) (2021). It is the insurer's burden to establish by a preponderance of the evidence its reasonable-basis defense. *Redies v. Att'ys Liab. Prot. Soc'y*, 150 P.3d 930, 937 (Mont. 2007). At summary judgment, UMIA failed to demonstrate that it had a reasonable basis in

7

law to contest the Underlying Claims or the amount of the Claims. (Doc. 129 at 15–27). As such, the jury was charged with "weigh[ing] the evidence and judg[ing] the credibility of the witnesses in determining whether [UMIA] had a 'reasonable basis' [in fact] for denying [the Underlying Claims]." *See Dean v. Austin Mut. Ins.*, 869 P.2d 256, 258 (Mont. 1994).

It is undisputed that UMIA's policies excluded coverage for any unlawful or knowingly wrongful acts, including fraud, by Dr. Arguelles or the AOC. (Doc. 285-1 at 183, 216, 227, 235–40, 276). UMIA thus argues that because it possessed information suggesting Dr. Arguelles engaged in fraudulent conduct, it had reasonable grounds to dispute coverage even as it settled the Underlying Claims. UMIA therefore contends it cannot be held liable under the UTPA, and judgment should be granted in its favor. UMIA highlights the following trial evidence to support its argument:

(1) Plaintiffs' MMLP Applications, indicating that Dr. Arguelles's deviation from the standard of care "may have been knowingly false and fraudulent" (*e.g.*, Doc. 281-1 at 180);

(2) UMIA Claim Consultant Kim Day's internal reserve reports and claim notes from the MMLP hearings, noting Dr. Arguelles's alleged fraudulent behavior and potential legal violations (*id.* at 161–62);

(3) information that the federal government had raided Dr. Arguelles's office

8

(Doc. 289 at 135–40);

(4) an email from Dr. Arguelles's civil defense attorney, Gary Kalkstein, summarizing a medical-expert review of Dr. Arguelles's treatment citing concerns of fraudulent activity (Doc. 285-1 at 9);

(5) a status report from that same attorney noting that Dr. Arguelles's criminal attorneys advised him to plead the Fifth Amendment in civil proceedings (Doc. 289 at 157, 162); and

(6) Plaintiffs' state court amended complaints, alleging a specific cause of action for fraud or constructive fraud (Doc. 281-1 at 1–13, 182–93).

UMIA emphasizes the importance of Plaintiffs' state court complaints, arguing that "[i]f UMIA had no reasonable basis to rely on the plain allegations of the operative [c]omplaint when the cases settled, then insurers can never contest coverage before a jury verdict." (Doc. 302 at 10).

Considering the cited evidence, and that UMIA's policies did not provide coverage for fraud, the jury could have found that Dr. Arguelles's alleged fraud provided UMIA with a reasonable basis to dispute Plaintiffs' Underlying Claims. However, the jury was permitted to consider other evidence during its deliberations. Akin to Plaintiffs' theory, the jury could have determined that UMIA invoked the uncovered fraud claim as a pretext to dispute the medical malpractice claim.

For example, at trial, Plaintiffs' expert, Martha Sheehy, opined that UMIA

9

properly determined its coverage of Plaintiffs' medical malpractice claims against Dr. Arguelles. (Doc. 296 at 136). This was evidenced by Day's Reserve Reports, which evaluated only the medical malpractice claims, not fraud. (*Id.* at 143). Day confirmed this fact when she testified that she did not have proof of fraud and did not review policy coverage based on fraudulent allegations. (Doc. 289 at 242). Her Reserve Reports—as they related to the medical malpractice claims—noted UMIA's low chance of defensibility, its "clear" liability under the circumstances, and expert medical statements opining that Dr. Arguelles acted below the standard of care. (*Id.*; Doc. 281-1 at 92, 104, 163–64). As such, Sheehy testified that, because UMIA's policy covered the medical malpractice claims, it was obligated to defend and indemnify them. (Doc. 296 at 140). In fact, according to Sheehy, Day and Kalkstein characterized the cases as "fast-tracked for settlement." (*Id.* at 147; Doc. 281-1 at 164).

During UMIA's investigation of the medical malpractice claims, however, UMIA ultimately discovered allegations of Dr. Arguelles's fraudulent conduct. (Doc. 296 at 139–40). These allegations are supported by the evidence highlighted by UMIA in its present Motion. *See supra* pp. 8–9. Nonetheless, Sheehy testified that, as a mixed-action state, Montana law would require UMIA to defend both the

medical malpractice and fraud claims even if coverage for either was uncertain.[2] (Doc. 296 at 141). She also stated that UMIA's UTPA duties to promptly and equitably settle covered claims would have remained unchanged in such circumstances. (*Id.* at 142). In her opinion, UMIA did not fulfill those duties. (*Id.* at 147). Rather, after Day determined liability was reasonably clear and requested settlement authority for the medical malpractice claims, UMIA did not settle, but rather, requested further investigation. (*Id.* at 147–48).

Two years later, before UMIA's mediation with Fryer, UMIA's then-Director of Early Intervention, Shelly Davis, wrote an email stating that she did "not see any rush to resolve [Plaintiffs'] cases, as time [was on UMIA's] side." (*Id.* at 182–83; Doc. 281-1 at 70). In Sheehy's opinion, this "statement [was the] smoking gun that [UMIA did] not intend to promptly settle [the Underlying Claims]." (Doc. 296 at 183). Thereafter, just before settlement, UMIA filed a declaratory judgment action against Plaintiffs. Although procedurally proper, Plaintiffs' expert Daniel Doucette

---

[2] UMIA argues that Sheehy misapplied Montana's mixed-action rule and therefore misled the jury. (Doc. 302 at 11). The Court disagrees. Although "an insurer's duty to defend is independent from and broader than its duty to indemnify," the mixed-action rule "requires an insurer to defend all counts in a complaint so long as one count potentially triggers coverage." *State Farm Fire & Cas. Co. v. Schwan*, 308 P.3d 48, 51 (Mont. 2013). This is exactly what Sheehy stated in her testimony: When "there is a claim for sure that falls within the scope of coverage, the medical negligence claim, UMIA must *defend* Dr. Arguelles against the medical negligence claim and, also, any other claims, even if they're not covered." (Doc. 296 at 141 (emphasis added)). She then testified that in this scenario, the presence of an uncovered claim alone does not provide a reasonable basis under the UTPA to deny the covered claim when liability has become reasonably clear. (*Id.* at 142). UMIA was free to challenge Sheehy's conclusion and indeed, offered evidence that it disputed the medical malpractice claim based on legitimate coverage concerns.

11

opined that this type of "tactic [did] nothing more than intimidate and frustrate" Plaintiffs. (Doc. 290 at 194).

In light of the testimony and evidence presented, the case presented issues on which reasonable jurors could differ. However, the Court's inquiry under Rule 50(b) is limited to whether any legally sufficient evidentiary basis supports the verdict, not whether the Court would have weighed the evidence differently. The reasonableness determination—central to both UTPA liability and UMIA's defense—turned on the jury's assessment of the evidence and witness credibility. Here, UMIA's internal communications and investigation, as interpreted by Plaintiffs' experts, supplied a sufficient evidentiary basis for the jury to find that UMIA lacked a reasonable basis to dispute coverage and failed to promptly settle once liability was clear. UMIA's argument that the evidence could support a different conclusion merely confirms that the verdict should stand.

Motion 1 is denied.

### 2. *Motion 4: Punitive Damages*

At trial, UMIA also sought judgment as a matter of law on Plaintiffs' punitive damages claim, arguing that Plaintiffs had not proffered sufficient evidence that UMIA acted with fraud or actual malice while handling the Underlying Claims. (Docs. 248, 249). The Court denied this motion, finding that this fact-intensive analysis should be submitted to the jury. (Doc. 297 at 5–7; *see also* Doc. 129 at 32–

12

36). Motion 4 renews UMIA's Rule 50(a) argument that the evidence cannot support a verdict for punitive damages, and that judgment as a matter of law under Rule 50(b) should be granted its favor. (Doc. 302 at 21–23).

In Montana, "reasonable punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice." Mont. Code Ann. § 27-1-221(1); (see Doc. 272 at 39).

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Mont. Code Ann. § 27-1-221(2); (see Doc. 272 at 42).

> A defendant is guilty of actual fraud if the defendant: (a) makes a representation with knowledge of its falsity; or (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury.

Mont. Code Ann. § 27-1-221(3); (see Doc. 272 at 41).

Punitive damages are proven by clear and convincing evidence, meaning "there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Mont. Code Ann. § 27-1-221(6). "[A]s with proof of the alleged UTPA violation itself, proof of actual malice [or fraud] depends on what the insurer knew or disregarded when it considered the subject claim." *Lorang v. Fortis Ins.*, 192 P.3d 186, 206 (Mont. 2008).

UMIA first argues that no evidence of actual malice was presented at trial. (Doc. 302 at 22). Despite Plaintiffs' theory that the medical malpractice claims had been "fast tracked" for settlement in late 2018, UMIA contends that Plaintiffs failed to provide UMIA with settlement demands until late 2019 and further failed to produce lien information until 2020. (*Id.*). Because of Plaintiffs' delay, UMIA concludes there was no basis for the jury to find that UMIA acted with intentional disregard of or deliberate indifference to the high probability of Plaintiffs' injuries. (*Id.* at 23).

However, in addition to the evidence UMIA cites, the jury also received evidence of Day's Reserve Reports from 2018 and 2020, which discussed Plaintiffs' declining health prognoses, identified UMIA's liability as "clear," and recommended resolution of the medical malpractice claims. (Doc. 281-1 at 86–92, 162–64). The jury also heard from Plaintiffs, who testified about their personal experiences during UMIA's claims investigation. Between May 2017 and the spring of 2021, Fryer recalled that:

> [t]he emotional thing that UMIA ha[d] caused [was] difficult because from day to day[, it was] like riding a roller coaster. . . . And anytime they c[a]me up with something new, [it was] more frustrating, like when they sued us. I mean, I was in tears. I just looked at my husband and I said "What else could they do to me?"

(Doc. 290 at 243). Between January 2018 and the spring of 2021, Davison likewise testified that she "broke down in tears" when UMIA brought the declaratory

judgment action. (*Id.* at 248). She thought that she and her husband "were going to lose everything." (*Id.*).

Whether UMIA's conduct clearly and convincingly reflected an intentional disregard of or deliberate indifference to a high probability of Plaintiffs' injuries was a fact-intensive inquiry appropriately submitted to the jury. Upon reviewing the record, the Court finds there was sufficient evidence showing that UMIA knew about Plaintiffs' declining health but failed to make payments despite the recommendation from Day. Plaintiffs' testimony highlighted the effects of UMIA's decision-making on their health and well-being. Because the jury was entitled to rely on Plaintiffs' evidence, credit Plaintiffs' testimony, and reject UMIA's explanations, the verdict must stand. Again, UMIA's argument that the evidence could support a different conclusion merely confirms the jury's decision.

UMIA next argues that the only evidence of actual fraud was its failure to correct Plaintiffs' state-court counsel Michael Eiselein's mistaken belief that only $1 million in policy limits were available, even though AOC's policy and Dr. Arguelles's policy *each* provided $1 million in coverage. (Doc. 302 at 21). UMIA contends this evidence is inconsequential and "cannot possibly support an actual-fraud finding" because Plaintiffs' demands were each less than $1 million. (*Id.* at 22). Eiselein, however, testified that UMIA did not correct his understanding for over two years. (Doc. 281-1 at 27; Doc. 290 at 49). Because punitive damages may

be assessed for an insurer that misrepresents coverage provisions of an insurance policy, Plaintiffs contend that the jury was properly instructed to consider UMIA's failure to correct Eiselein. (Doc. 309 at 23 (citing *Lorang*, 192 P.3d at 210)).

The Court agrees with Plaintiffs. Assessing the weight of Eiselein's testimony and resolving any credibility issues were matters exclusively for the jury. Under Rule 50(b), the Court may not substitute its own view of the evidence for that of the jury. Here, Plaintiffs' eventual demand amounts did not alter UMIA's obligation to accurately disclose the policies' limits under Montana law. Given that a reasonable juror could conclude that UMIA's two-year delay constituted a concealment of a material fact with the purpose of depriving Plaintiffs of their prompt payment, there is sufficient evidence that UMIA committed fraud.

As the jury was required to find actual malice *or* actual fraud, and the evidence supports either finding, the Court declines to set aside the punitive-damages award.

Motion 4 is denied.

### B.   Motions 2, 5–10: UMIA's Motions for a New Trial

Federal Rule of Civil Procedure 59(a)(1)(A) permits a court, on motion, to "grant a new trial on all or some . . . issues . . . for any reason" that federal courts have historically granted a new trial. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are

excessive, or that, for other reasons, the trial was not fair to the [moving party]." *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has specifically held that a motion for a new trial may be granted "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods. Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "However, a district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

District courts are provided with broad discretion to grant such motions given the highly fact-dependent nature of this inquiry and the trial judge's superior vantage point. *Molski*, 481 F.3d at 729. A trial judge thus has a

> duty, to weigh the evidence as [she] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where . . . the verdict is contrary to the clear weight of the evidence, or to prevent . . . a miscarriage of justice.

*Murphy*, 914 F.2d at 187 (citation modified). With these principles in mind, the Court turns to UMIA's Motions for a new trial.

### 1. Motion 2: Compensatory Damages

UMIA first seeks a new trial, or alternatively remittitur, arguing that the jury's $6 million compensatory-damages award was excessive. (Doc. 302 at 12–18). It claims a new trial is warranted because: (1) neither Plaintiff provided "substantial

17

evidence" to justify $6 million in emotional-distress damages; (2) the award was untethered to the trial evidence; and (3) Plaintiffs' testimony violated the Court's pretrial order and tainted the verdict. (*Id.* at 15–17). Alternatively, UMIA seeks to reduce the award to $250,000 per Plaintiff. (*Id.* at 18).

UMIA's primary argument, however, incorrectly relies on federal circuit precedent to measure excessiveness. Although federal procedure rules govern how the Court applies the standard for a new trial, state law determines what constitutes an excessive verdict—a point acknowledged in one of UMIA's cited authorities. (Doc. 302 at 13 (citing *Cosby v. AutoZone, Inc.*, 445 F. App'x 914, 916 (9th Cir. 2011)). The *Cosby* court wrote: "In reviewing a damages award for excessiveness, a district court, sitting in diversity, applies state law for measuring excessiveness." 445 F. App'x at 916 (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429–31, 434–36 (1996)). As such, the Court proceeds under Montana law to determine excessiveness.

Under Montana law, when emotional distress is claimed as an element of damage, as was the case here, the law does not set a definite standard by which to calculate compensation. *Jacobsen v. Allstate Ins.*, 215 P.3d 649, 664 (Mont. 2009). Indeed, that framework is reflected in Montana's pattern jury instruction, which was provided to the jury in this case. (Doc. 272 at 37). It states that: "[Montana] law does not set a definite standard by which to calculate compensation for mental and

emotional suffering and distress. . . . The compensation must be just and reasonable." (*Id.*); *see* Mont. Code Ann. § 27-1-302(1) ("[D]amages must in all cases be reasonable."). As such, "the proper measure of compensatory damages must be determined solely based on the facts of each case, and juries have wide latitude in this regard." *Seltzer v. Morton*, 154 P.3d 561, 588 (Mont. 2007) (internal citations omitted). Thus, an award can only "be reduced when it substantially exceeds that which the evidence can sustain." *Maurer v. Clausen Distrib. Co.*, 912 P.2d 195, 199 (Mont. 1996). In other words, a court will intervene "[o]nly when the amount awarded is so grossly out of proportion to the injury as to shock the [court's] conscience." *Onstad v. Payless Shoesource,* 9 P.3d 38, 46 (Mont. 2000).

At trial, Plaintiffs, their husbands, and Eiselein testified about the emotional stress Plaintiffs experienced while waiting for UMIA to settle their claims. Fryer stated that while she "still had everything that was wrong with [her physically]," she wanted to put the whole experience behind her but could not because the Underlying Claims "dragged out so long." (Doc. 290 at 242). She recalled that UMIA "kept delaying and it just made things worse." (*Id.* at 243). For her, the "physical [harm] . . . is a lifetime thing. The emotional thing that UMIA . . . caused is difficult because from day to day [it was] like riding a roller coaster. . . . And anytime they c[a]me up with something new, [it was] more frustrating." (*Id.*). Throughout the four years that she had her lawsuit against Dr. Arguelles, "[she] felt like [UMIA did not] care .

19

. . about [her]." (*Id.* at 245). Her husband testified that throughout the lawsuit against Dr. Arguelles, she was sad, anxious, and worried. (*Id.* at 253). She took nerve pills, and after she received the news about UMIA's declaratory judgment action, she started crying and asked her husband, "what more could [UMIA] do to me?" (*Id.* at 254).

Davison explained that after UMIA filed the declaratory judgment action, she thought that she and her husband were "going to lose everything." (*Id.* at 248). She brought the lawsuit against UMIA, hoping to "get back some of [her] life[, a]nd not worry about . . . bills." (*Id.*). For her, the underlying litigation feels "like it's been forever." (*Id.* at 249). She has felt "[s]ad[, c]onfused[, and] hurt." (*Id.*). Her husband testified that between January 2018 and spring of 2021, he watched her "health deteriorate"; her stress was "through the roof"; and "she was beat up." (*Id.* at 260–62). As Eiselein described it: while Dr. Arguelles "wounded [Plaintiffs]; [UMIA] poured salt in the wounds." (*Id.* at 93).

Here, the jury was properly instructed that Plaintiffs were entitled to reasonable compensation for mental and emotional suffering and distress, and the law does not set a standard by which to calculate compensation for mental pain and suffering. Having considered the evidence introduced at trial, the Court finds that the jury's compensatory-damages award is not so grossly disproportionate to Plaintiffs' four years of stress-related injuries that it shocks the conscience.

Accordingly, the Court will neither order a new trial nor a remittitur of the damages awarded.

Motion 2 is denied.

### 2.    *Motion 5: UMIA's Expert John Sullivan*

UMIA next seeks a new trial on the grounds that it was deprived of a fair trial when the Court excluded its expert, John Sullivan, from testifying. (Doc. 302 at 23–26). It claims the Court's error left the jury with an incomplete picture of the federal investigation into Dr. Arguelles and deprived UMIA of an opportunity to rebut Eiselein's and Doucette's incorrect legal assertions. (*Id.* at 23, 26).

Before trial, the Court ruled on Sullivan's admission—concluding he was a qualified expert under Federal Rule of Evidence 702—but reserved ruling on the admissibility of his opinions until it reviewed the information underlying them at trial. (Doc. 214 at 10, 13–15). In this case, only the "operative facts of Plaintiffs' [Underlying Claims], and the information available to UMIA during the adjustment process, [were] probative to the merits of the UTPA claim." (*Id.* at 13). Thus, Sullivan's opinions would only be "reasonably reliable if based on information UMIA knew at the time of the claims-adjustment process. . . . Otherwise, his opinions [would] risk misleading the jury into misusing inappropriate evidence for substantive purposes." (*Id.* at 14).

When revisiting the motion at trial, the Court determined that Day's

testimony—as one of UMIA's Claim Consultants—constituted "the best evidence as to what UMIA knew about any of [Plaintiffs'] claims, . . . [and] specifically about the [f]ederal investigation while she was handling the claims." (Doc. 297 at 158). Based on Day's testimony and her Reserve Reports, UMIA "knew about the existence of the search warrant and" generally, what had been taken as a result of the search. (*Id.*). Julia Houser, one of UMIA's team leads, also testified that she knew about the search warrant. (*Id.* at 158–59). She provided her opinion about probable cause and why the search warrant constituted a "serious circumstance that [UMIA] needed to take into consideration." (*Id.* at 159). Houser's testimony was therefore "the best evidence of . . . how serious [UMIA] knew [the] situation was with the [f]ederal [g]overnment . . . and . . . how that impacted [its] claims handling." (*Id.*). Additionally, the jury was presented with numerous emails regarding the fraud investigations, the fraud allegations made by Eiselein, and how that information impacted and interplayed with UMIA's claims-handling. (*Id.* at 160). Because the jury had heard the best evidence as to what UMIA knew about the federal government's investigation into Dr. Arguelles's practice, when it became known, and how it impacted UMIA's claims handling, the Court ultimately found that Sullivan's testimony would be cumulative. The Court therefore excluded his testimony under Federal Rule of Evidence 403.

UMIA's contention that the jury "was left with the incomplete and incorrect

22

view that the federal investigation into [Dr.] Arguelles was unrelated to [his treatment of Plaintiffs]" is therefore inaccurate. (Doc. 302 at 24–25). Although Plaintiffs' witnesses, Eiselein and Doucette, testified that the federal investigation into Dr. Arguelles might have been nothing more than a billing issue (Doc. 290 at 32–33, 36, 80, 209, 213), the jury had ample evidence to find otherwise. In addition to Houser's and Day's testimony, the jury had Day's Reserve Reports, stating that UMIA believed the Department of Justice ("DOJ") was "investigating whether Dr. Arguelles . . . benefit[ed] from making unnecessary claims for diseases his patients did not have." (Doc. 281-1 at 83). This point was emphasized during Houser's direct examination by defense counsel Mark Malloy. Malloy stated: "[T]here's been some suggestion in this case that there [were] only billing records . . . taken [pursuant to the DOJ's warrant]. Is that the information UMIA had?" (Doc. 297 at 55). Houser responded: "No. Absolutely not. . . . [I]t was our understanding that [the DOJ] went in and seized protected patient records. So they weren't just looking at billing records; they were looking at . . . patient . . . medical records, as well." (*Id.* at 56). Houser went on to speak about the significance of the search warrant and her concern that Dr. Arguelles's criminal activity "would take [Plaintiffs'] claims outside of coverage." (*Id.* at 57–58). Houser's testimony and Day's Reserve Reports encompass the testimony UMIA asserts Sullivan would have provided. (*See* Doc. 314 at 9–10 ("Sullivan planned to testify [that] . . . the [DOJ] investigation went far

23

beyond a mere 'billing discrepancy' and instead centered on whether Dr. Arguelles was providing fraudulent medical treatment to his patients.")).

The evidence further provided UMIA with a rebuttal to Plaintiffs' characterization of the investigation, which UMIA presently asserts it could not have offered without Sullivan's testimony. As shown above, UMIA had access to the evidence at trial that it now contends was not admitted. Once admitted, it became UMIA's responsibility to determine how to use that evidence in presenting its case. It was then the jury's exclusive role to evaluate the witnesses' testimony and to draw whatever factual conclusions it deemed appropriate. The Court finds no error in this approach and rejects UMIA's argument that excluding Sullivan's testimony shielded the jury from "hear[ing] the truth" when the alleged absence of evidence was, in fact, available and presented. (*See id.* at 11). Accordingly, the Court finds that excluding Sullivan's testimony did not substantially influence the trial's outcome or the jury's verdict. Nor did it result in a miscarriage of justice to warrant a new trial.

Motion 5 is denied.

### 3.    *Motion 6: Amounts Paid on Other UMIA Claims*

UMIA next seeks a new trial on the grounds that the Court's exclusion of evidence regarding the amounts paid on other claims "gave the jury an incomplete picture that UMIA valued the claims against [Dr.] Arguelles identically without considering each claim's evidence." (Doc. 302 at 26–28).

Before trial, the Court prohibited evidence from "other claimants who brought similar malpractice claims against Dr. Arguelles and the AOC." (Doc. 169 at 15). This exclusion extended to expert Doucette's testimony regarding the comparison between Plaintiffs' case and a similar case from South Dakota. (Doc. 168 at 18–19). Nonetheless, the Court allowed Doucette to use "the term 'one-size-fits-all' in the context of Plaintiffs' claims and UMIA's evaluation of those claims, not UMIA's general practice." (*Id.* at 22). Doucette's testimony was therefore limited to his analysis of the facts in this case.

At trial, Doucette provided his opinion as to UMIA's offer of $250,000 to each Plaintiff. He stated:

> [T]here were many, many, many differences and similarities - - there were both but a lot of differences between the two claims. And when Mr. Kalkstein and Ms. Day analyzed it, they came up to separate conclusions, and you could see why they reached those conclusions.
> All of a sudden it gets to the home office and these numbers are totally ignored. They don't come anywhere near it, and they just pick a number and say "Both claims are worth $250,000."
> An insurance company has an obligation to individually analyze and evaluate a claim. That fell apart here. It had been - - it had happened in the beginning, but it fell apart here when they just say "We don't care about the facts; we don't care whether you've got a wage loss; we don't care if you've got a coverage question; you're both worth $250,000 and that's it."
> That's not the way you do it. That's the one-size-fits-all mentality and that's inappropriate.

(Doc. 290 at 198–99).

After this testimony, UMIA sought to introduce evidence of the five other

25

claimants harmed by Dr. Arguelles and the amounts UMIA paid to each of those claimants, arguing that Doucette opened the door to such evidence. (*Id.* at 201). The Court disagreed, stating that in line with the order in limine, Plaintiffs offered Doucette's opinion as to Plaintiffs' claims only, and therefore denied UMIA's request. (*Id.* at 202–03).

The Court again disagrees with UMIA and does not find that the exclusion of the other claimants' payments led to a verdict against the clear weight of the evidence. Nor did the exclusion constitute a miscarriage of justice or result in actual bias. The Court held throughout the litigation that, consistent with Montana law, "[e]ach [UTPA] case must . . . depend on its own peculiar facts," (*E.g.*, Doc. 169 at 15 (quoting *French v. Ralph E. Moore, Inc.*, 661 P.2d 844, 849 (Mont. 1983)), and testimony must "remain[] tethered to the facts of [the] case." (*E.g.*, Doc. 168 at 22). The important inquiry underlying Plaintiffs' claims and UMIA's defense centered around what UMIA knew at the time it adjusted the Underlying Claims. It was therefore proper to deny UMIA's request so that all testimony and evidence remained concentrated on the relevant parties, timeline, and facts. This denial does not require a new trial.

Motion 6 is denied.

### 4. *Motion 7: UMIA's Declaratory Judgment Complaint*

UMIA next seeks a new trial on the grounds that the testimony adduced by

Plaintiffs at trial exceeded the Court's pretrial order excluding Plaintiffs from calling UMIA's declaratory judgment complaint "an abuse of process or procedurally improper." (Doc. 302 at 28–30 (citing Doc. 168 at 17–18)). UMIA claims it "had to do exactly what "this Court's pretrial order sought to prevent—justify filing a [d]eclaratory [j]udgment action that this Court had already determined was properly filed." (*Id.* at 29).

The Court's pretrial order was expressly directed at UMIA's motion to exclude Doucette's "opinion that UMIA filed a declaratory judgment action to improperly leverage settlement against Plaintiffs." (Doc. 168 at 17). The Court determined that Doucette was prohibited from "opin[ing] that the declaratory action was an abuse of process or procedurally improper." (*Id.* at 18). However, the Court found that Doucette's proposed testimony did not characterize the declaratory action as procedurally improper and therefore permitted him to opine that the action "was one 'tactic' UMIA employed to delay settlement." (*Id.*).

In its present Motion, UMIA does not challenge Doucette's testimony. Rather, it contends that Plaintiffs, through their statements and the testimony of Eiselein and Sheehy, repeatedly argued that the declaratory action was procedurally improper. (Doc. 302 at 29). The Court disagrees with UMIA's characterization of the trial testimony and finds that Eiselein's and Sheehy's testimony did not violate

27

the pretrial order, did not lead to a verdict against the weight of the evidence, and did not result in a miscarriage of justice.

Eiselein testified that the purpose of the declaratory action against Plaintiffs "was to try to get out of [its payment] obligation" (Doc. 290 at 92), and Sheehy testified that the action was filed "in furtherance of [UMIA's] decision to make sure that time was on their side" (Doc. 296 at 189). Plaintiffs then used this testimony to support their theory that the declaratory action was one tactic UMIA used to delay settlement, not that the action was procedurally improper. (*See* Doc. 309 at 28). Nothing at trial prevented UMIA from disagreeing with this theory. Indeed, it cross-examined Plaintiffs' witnesses on this exact issue, giving it a full opportunity to challenge and rebut Plaintiffs' theory. (*E.g.*, Doc. 296 at 206–08; Doc. 290 at 121–24).

As there is no reason to order a new trial under these circumstances, Motion 7 is denied.

> ### 5. *Motion 8: Dr. Arguelles's Settlement with the Federal Government*

UMIA next seeks a new trial on the grounds that it was unfairly prejudiced when the Court excluded evidence of Dr. Arguelles's $2 million settlement with the federal government. (Doc. 302 at 30–32). UMIA argues that after the evidence was excluded in a pretrial order, Plaintiffs opened the door to the evidence by implying that Dr. Arguelles did not commit fraud because he was neither indicted nor charged

with a crime. (*Id.* at 30). Because the Court did not allow UMIA to introduce the $2 million settlement amount, UMIA claims it was unfairly prejudiced. (*Id.* at 32). The Court disagrees.

At trial, Plaintiffs' counsel, Jon Moyers, asked various witnesses whether Dr. Arguelles had ever been indicted. Moyers asked Day: "there was never a [f]ederal indictment; is that right?" (Doc. 289 at 242). He asked Eiselein whether Dr. Arguelles was "[e]ver indicted," (Doc. 290 at 33) and UMIA's expert, Mollie O'Brien whether she was "aware that the [f]ederal [g]overnment never charged or indicted Dr. Arguelles." (Doc. 296 at 79). UMIA objected to this line of questioning, and the Court initially overruled the objection. (*E.g.*, *id.*).

Subsequently, UMIA sought to introduce the federal government's settlement amount, arguing that Plaintiffs had "opened the door to the resolution of the [f]ederal proceedings against . . . Dr. Arguelles by virtue of talking about whether he was indicted or not." (*Id.* at 97). UMIA believed "that the jury should know that [Dr. Arguelles] ended up paying $2 million in fines . . . in exchange for disposition of the charges against him or any charges against him." (*Id.*).

After the parties discussed the matter on the record (*Id.* at 96–108), the Court stated:

> . . . I think, in hindsight, that whether Dr. Arguelles was indicted, whether he settled with the [g]overnment by paying some money really is irrelevant to the determinations that UMIA was making because that all happened after the fact, after it was settled.

29

> And so what I think should happen is I should give a cautionary instruction to the jury and tell them to disregard that . . . . [I]t really is not relevant to the . . . issues that they need to consider.

(*Id.* at 108). The parties agreed to a cautionary instruction, which the Court provided on the record:

> . . . [L]adies and gentlemen, there was an objection to the testimony about whether Dr. Arguelles ultimately was . . . indicted. That means whether he was charged with anything as a result of the [f]ederal investigation.
>
> That is completely irrelevant to your determination of this case, and the objection was appropriate. I ruled incorrectly in hindsight.
>
> And so I want to tell you - - and I think that it's come before you through other testimony, too. But whether or not he was indicted or how that [f]ederal investigation was resolved has nothing to do with your decision because all of that happened after these claims were settled.
>
> And what you will hear when I formally instruct you on the law in this case is that what you have to consider is what the parties knew at the time that these claims were being reviewed and handled, not something that happened after the fact that they didn't know, because it couldn't have impacted their decision-making.
>
> So . . . I'm going to strike that testimony and order you to disregard that testimony when you ultimately go back to deliberate and make your decision. After-the-fact evidence is . . . not relevant to the decision-making process that they engaged in.

(*Id.* at 111–12).

The Ninth Circuit has consistently held that "[a] timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate." *United States v. Merino-Balderrama*, 146 F.3d 758, 764 (9th Cir. 1998) (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986)); *United States v. Berry*, 627 F.2d 193, 198 (9th Cir. 1980). UMIA

does not argue that the Court's cautionary instruction was inadequate. Nor does the Court conclude that Plaintiffs' questioning, or the witnesses' testimony were highly prejudicial given the issues and evidence in the case. The jury had ample evidence to consider whether UMIA had violated the UTPA, or whether UMIA had a reasonable basis to dispute coverage, outside of the fact that Dr. Arguelles was never indicted. Given the timely nature of the cautionary instruction, the Ninth Circuit's presumption that juries follow such instructions, and absent compelling reasons to rule otherwise, the Court does not find that a new trial is warranted.

Motion 8 is denied.

### 6.   Motion 9: Jury Instruction 23

UMIA next seeks a new trial on the grounds that Jury Instruction 23 ("Instruction 23") "improperly informed the jury of the law," arguing that the Instruction incorrectly stated that "UMIA 'refused' to pay the claims"—despite its $250,000 payments on each—and was improperly premised on Plaintiffs' theory that UMIA failed to timely file its declaratory judgment. (Doc. 302 at 33; Doc. 314 at 14). The Court disagrees.

Instruction 23 was given as follows:

> Defendants are insurance companies licensed to conduct business in the State of Montana. It is a violation of Montana law for Defendants:
>     A. to refuse to pay claims without conducting a reasonable investigation based upon all available information; or,

> B. to neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.
>
> If you find that Defendants violated any of these laws, you should then determine whether such violation caused harm to Donna Fryer and Barabara Davison.

(Doc. 272 at 28).

Instruction 23 set forth the applicable legal standard under the UTPA. Indeed, Part A is a verbatim recitation of Montana Code Annotated § 33-18-201(4) (2021)— "a person may not . . . refuse to pay claims without conducting a reasonable investigation based upon all available information." (*See* Doc. 272 at 28). Whether the $250,000 payments or the declaratory judgment amounted to a refusal to pay Plaintiffs' claims was a matter reserved for the jury. UMIA's present argument highlights the factual disputes, and the application of those facts to the law, but it does not dispute that Instruction 23 was the correct legal standard.

Because Instruction 23 was legally sound, UMIA is not entitled to relitigate the jury's credibility determinations or reweigh the evidence. Therefore, it cannot claim that providing the correct legal standard established unfairness or a miscarriage of justice under Rule 59.

Motion 9 is denied.

### 7.   *Motion 10: Special Verdict*

In its final motion under Rule 59, UMIA seeks a new trial on the grounds that the special verdict form "improperly conflated" whether Plaintiffs had proven

liability with whether UMIA had established its affirmative defense, thereby "confusing the jury." (Doc. 302 at 34). It contends that because the verdict form lacked a separate question related to UMIA's reasonableness defense, the issues were conflated, and a new trial should be granted.

When a party challenges a verdict form, a court must consider "whether the questions in the form were adequate to obtain a jury determination of the factual issues essential to judgment." *Smith v. Jackson*, 84 F.3d 1213, 1220 (9th Cir. 1996). Courts in the Ninth Circuit recognize that jury instructions and special verdict forms must be considered together when evaluating whether the jury was properly guided. *E.g., K.J.P. v. County of San Diego*, 621 F. Supp. 3d 1097, 1135 (S.D. Cal. 2022) (finding that "the . . . standard in the special verdict form, taken together with the jury instructions, was correct"); *LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 618 (9th Cir. 2026) (finding that "the special verdict form, when considered with the instruction as a whole, fully and fairly presented to the jury the issues it was called upon to decide" (citation modified)).

Here, the Court concludes that both the special verdict form and the jury instructions were adequate to obtain a jury determination, and were likewise fully and fairly presented to the jury. Moreover, UMIA expressly withdrew its objection to the verdict form at trial on the very issue it now raises, eliminating any basis for its present challenge. (Doc. 298 at 20). Before closing arguments, the Court settled

33

jury instructions and the verdict form with the parties on the record. Upon finding

the proposed verdict forms to be inadequate, the Court permitted Plaintiffs to

resubmit. (Doc. 297 at 203). The following discussion occurred:

> THE COURT: Do you have any objection to going through that process with each plaintiff?
>
> MR. MALLOY: I don't.
>       My objection would be that we don't have a question with regard to the reasonable basis in fact and law to contest affirmative defense, which is Question No. 2 on my verdict.
>
> THE COURT: I'm trying to figure out how we're going to work that in.
>       But that's kind of encompassed . . . in the question about whether [UMIA] violated the Montana UTPA . . . which I think is argument to the jury - - because, if the jury finds that you had a reasonable basis in law or fact to contest it, then you didn't violate the Montana UTPA.
>       So I . . . think that . . . the defense is kind of incorporated into the question of did you violate the UTPA.
>       Do you understand what I'm saying?
>
> MR. MALLOY: I . . . understand what you're saying. I just think there should be a separate question on . . . that separate issue.
>
>       . . . .
>
> THE COURT: . . . I know you've set forth an affirmative defense. You have to prove it by a preponderance of the evidence.
>       But is there any rule of law or instruction or anything that says that . . . [the] question has to be answered on a verdict specifically?
>
> MR. MOYERS: No.
>
>       . . . .

THE COURT: So I'm going to give . . . the verdict form [P]laintiffs are going to propose that we just talked about that is a little more streamlined and straightforward.

For the record, do you want to object to that?

MR. MALLOY: Yes, I would.

THE COURT: Okay. So, over objection, I'll give that.

(*Id.* at 203–05).

The following Monday, the parties reconvened once more to review and finalize Plaintiffs' proposed verdict form (Doc. 241) as well as several jury instructions. UMIA opposed Plaintiffs' form (Doc. 251) and filed its own proposed form (Doc. 252) for the Court's review. The following discussion occurred:

> MR. MALLOY: So if [the] verdict does not have a question on reasonable basis to contest coverage, I do believe we need [UMIA's proposed 14 that instructs on the reasonable basis to contest coverage]. Or we have to add the question [to the verdict]: "Was there a reasonable basis to contest coverage?" And there is some authority to do that.
> I did find another . . . case out of this district from 2012 where . . . they did ask that question as the first question [on the verdict form] . . . .
> But if we're not going to give . . . a separate question on reasonable basis to dispute coverage, then I believe [UMIA's proposed 14] is necessary so that we can explain to the jury that that is our burden, and what the law is.
>
> . . . .
>
> THE COURT: So I'll give [UMIA's proposed] 14 with the typo corrected.
>
> . . . .

Now as to verdict forms, when I was talking . . . about [P]laintiffs' verdict form being better on Friday . . . one of the things I didn't like about it was . . . [d]id the defendants violate Montana law?

And I said I thought it has to say, [d]id the defendants violate the Montana Unfair Trade Practices Act? [A]nd if yes, and so forth. And so I think actually that the [D]efendants' proposed verdict form follows more closely what I was trying to communicate Friday - - did they violate the Unfair Trade Practices Act, yes or no? Did it cause damages, yes or no?

. . . .

And so I'm going to refuse Plaintiffs' amended proposed verdict form, and I'm going to use Defendants' proposed verdict form No. 2.

. . . .

MR. MOYERS: Your Honor, there'll need to be adjustments made to that verdict form as it's been proffered to the Court.

THE COURT: Defendants'?

MR. MOYERS: Yes.

. . . .

THE COURT: [H]ow do you want it to read?

MR MOYERS: I think it should be, [d]id UMIA and Constellation violate the handling of Barbara Davison's claims against Arguelles and AOC.

THE COURT: Okay. I see what you're saying.
Do you have any objection?

MR. MALLOY: I don't have any problem with that, Your Honor.

. . . .

Subject to our prior objection . . . related to our prior verdict that we do believe the reasonable basis to contest coverage should be on the verdict. But I understand the Court's decision in that regard.

. . . .

THE COURT: So we need to take the parentheses out of around "and Constellation" in each question. And in question 1 we need to add after Dr. Arguelles and AOC. And I think in question 3, it has to say what amount of money will fairly and reasonably compensate; that's usually the term of art that we [use.]

. . . .

MR. MORRIS: Yes, Your Honor. I'm assuming . . . you want us to file that as special verdict 2A. Or just resubmit it.

. . . .

THE COURT: I mean, so long as you're agreeing with it. If . . . for the record, as long as you agree with those changes.

MR. MALLOY: We do agree with those changes, subject to our prior objection that there should be a separate question on reasonable basis to dispute coverage.

THE COURT: Yeah, but I don't know where you are suggesting that would go.

MR. MALLOY: I think that should be the first question. Because if there is reasonable basis in law to dispute coverage, then we don't even get to the UTPA.

THE COURT: You said you had [a verdict form] from the case you looked at. What was the case cite that you looked at from 2012?

MR. MALLOY: Judge, we'll withdraw that objection and go with our verdict.

THE COURT: With the one we've talked about?

37

MR. MALLOY: Yes.

(Doc. 298 at 7–8, 15–17, 19–20).

After UMIA withdrew its objection and the parties finalized the last few instructions, the Court provided the following jury instructions in conjunction with UMIA's proposed verdict form (Doc. 264). Instruction 29 stated:

> Defendants have the burden of proving by a preponderance of the evidence that they had a reasonable basis in law or in fact for contesting the Donna Fryer and Barbara Davison claims or the amount of the claims.

(Doc. 272 at 34). Instruction 30 stated:

> You must determine whether UMIA (and Constellation) had a reasonable basis to contest whether Ms. Fryer and Ms. Davison's claims were covered by the UMIA Policy issued to Dr. Arguelles. Without coverage, a duty to settle does not arise, even if the facts indicate that . . . Dr. Arguelles'[s] liability was reasonably clear. If UMIA (and Constellation) had a reasonable basis to conclude that Ms. Fryer and Ms. Davison's claims were not covered, it may not be held liable under the Montana Unfair Trade Practices Act.

(*Id.* at 35). The verdict form then stated:

> QUESTION NO. 1: Did UMIA and Constellation violate the Montana Unfair Trade Practices Act in its handling of Barbara Davison's claims against Dr. Enrico Arguelles and AOC?
>
> . . . .
>
> QUESTION 2: Was UMIA's and Constellation's violation of the Montana Unfair Trade Practices Act a cause of damage to Ms. Davison?
>
> . . . .

38

QUESTION 3: What amount of money will fairly and reasonably compensate Ms. Davison for the damages caused by UMIA and Constellation?

. . . .

QUESTION 4: Were UMIA and Constellation guilty of actual malice or actual fraud in their handling of Barbara Davison's claims against Dr. Arguelles?

(Doc. 267 at 1–2). The same questions were asked as it related to Fryer's claims. (*Id.* at 2–4).

Because jury instructions may be read in conjunction with the verdict form, the Court finds that the jury was fully and fairly presented with the issues. Indeed, Instruction 30 properly informed the jury that if UMIA had a reasonable basis to dispute coverage then it could not be held liable under the UTPA. Instruction 30 read in conjunction with the verdict form—asking whether UMIA violated the UTPA—means the jury could have answered "no" to the first question on the verdict form if they found that UMIA had presented enough evidence in support of its defense. If UMIA had any concern that the jury might confuse or conflate the issues during deliberations, nothing prevented it from using its closing argument to walk through the verdict form and instructions. (*See* Doc. 298 at 70, 82).

Accordingly, notwithstanding the fact that UMIA withdrew its objection at trial, the Court finds that omitting the reasonable-basis question from the verdict form did not result in a miscarriage of justice nor prejudice the jury's determination

39

of the factual issues essential to judgment. For these reasons, a new trial is not warranted.

Motion 10 is denied.

C.     *Motion 11: UMIA's Motion to Stay Execution of Judgment Pending Appeal*

In its final Motion, UMIA seeks a stay of execution of the judgment without the posting of a bond or other security. (Doc. 302 at 34–36). UMIA brings it Motion pursuant Federal Rule of Civil Procedure 62(b) but argues the Motion using the standard under Federal Rule of Appellate Procedure 7 ("Appellate Rule 7"). In doing so, UMIA conflates two rules that serve fundamentally different functions. Rule 62(b) governs whether the judgment can be enforced and what security is required to stay enforcement. By contrast, Appellate Rule 7 governs only the narrow question of securing "costs on appeal." The standards, purposes, and financial exposures are not interchangeable. Given that UMIA seeks a stay of execution pending appeal (Doc. 302 at 34), the Court treats the filing as a Rule 62(b) motion and applies the Rule 62(b) framework.

Pursuant to Rule 62(b), "a party may obtain a stay by providing a bond or other security" any time after entry of judgment. "The bond or security protects the prevailing party 'from the risk of a later uncollectible judgment and compensates him for delay in the entry of the final judgment.'" *United States v. Birdsong*, No. CV 17-72-M, 2019 WL 1026277, at *1 (D. Mont. Mar. 4, 2019) (quoting *NLRB v.*

40

*Westphal*, 859 F.2d 818, 819 (9th Cir. 1988)).  A district court may modify or waive the bond requirement. *Int'l Telemeter Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th Cir. 1985).

The Ninth Circuit has yet to define the criteria for waiving the bond or security.  However, district courts within the Ninth Circuit have considered the following factors when deciding whether to do so:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Birdsong*, 2019 WL 1026277, at *2 (quoting *Dillon v. City of Chicago*, 866 F.2d 902, 904 (7th Cir. 1988)); *Chavez-DeRemer v. NAB, LLC*, No. 2:21-cv-00984, 2025 WL 2308676, at *1 (D. Nev. Aug. 11, 2025); *United States v. Moses*, No. 4:19-cv-00108, 2021 WL 1617376, at *2 (D. Idaho Apr. 23, 2021).  The moving party has the burden to demonstrate why a district court should "depart[] from the usual requirement of a full security supersedeas bond." *Moses*, 2021 WL 1617376, at *2 (citation modified).

UMIA does not explicitly address these factors because it argues under the factors applicable to Appellate Rule 7.  However, UMIA does state it "has the financial ability to post a reasonable bond, [and] there is no risk or suggestion that

41

[it] would fail to pay costs if its appeal was unsuccessful." (Doc. 302 at 35). Considering the factors above and that "unsecured stays under Rule 62(b) [are generally] reserved for 'exceptional' cases," *Oskowis v. Sedona Oak-Creek Unified Sch. Dist. #9*, No. CV-17-08070, 2019 WL 6250762, at *2 (D. Ariz. Nov. 22, 2019) (citation modified), UMIA's request for a waiver of the bond requirement must be denied.

## III.  Conclusion

IT IS HEREBY ORDERED that:

(1)   Plaintiffs' Motion to Strike/Disregard New Evidence (Doc. 315) is GRANTED; and

(2)   UMIA's Post-Verdict Motions (Doc. 301) are DENIED.

DATED this 27th day of July, 2026.

SUSAN P. WATTERS
United States District Judge

42