IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DONNA FRYER and BARBARA DAVISON,<br><br>Plaintiffs,<br><br>vs.<br><br>UMIA, an insurance company, and CONSTELLATION, INC., a mutual insurance holding company, doing business as "Constellation®",<br><br>Defendants. | CV 22-14-BLG-SPW<br><br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON PUNITIVE DAMAGES |

**INTRODUCTION**

On November 10, 2025, a jury returned a special verdict awarding Plaintiffs Donna Fryer and Barbara Davison punitive damages. (Docs. 268, 269). Pursuant to Montana Code Annotated § 27-1-221(8)(c) (2025), the Court is required to review the jury's award of punitive damages, consider the factors listed in § 27-1-221(8)(b), and submit findings of fact and conclusions of law stating the Court's reasons for increasing, decreasing, or affirming the award. It is within the Court's discretion to adjust the award. *Marie Deonier & Assocs. v. Paul Revere Life Ins.*, 101 P.3d 742, 749 (Mont. 2004).

Defendants UMIA and Constellation, Inc. (collectively, "UMIA") and Plaintiffs submitted simultaneous briefs to the Court supporting their respective

1

positions as to whether the award should be adjusted. (Docs. 304, 305). For the following reasons, the Court AFFIRMS the jury's punitive damages award.

## FINDINGS OF FACT

### In General

1. Fryer was a patient of Dr. Enrico Arguelles at his clinic, the Arthritis & Osteoporosis Center (the "AOC"), in Billings, Montana in 2009.

2. Davison was Dr. Arguelles's patient at the AOC in Billings, Montana in 2014.

3. Dr. Arguelles diagnosed and treated each Plaintiff for seronegative rheumatoid arthritis—a condition they later discovered they did not have.

### Plaintiffs' Underlying Claims

4. Fryer submitted a claim against Dr. Arguelles and the AOC to the Montana Medical Legal Panel ("MMLP") in May 2017, alleging that Dr. Arguelles's "deviat[ion] from accepted standards of medical care. . . . was negligent and may have been knowingly false and fraudulent." (Doc. 281-1 at 178–81).

5. Davison submitted a claim against Dr. Arguelles and the AOC to the MMLP in January 2018, alleging that Dr. Arguelles "violat[ed] the standard of care by diagnosing [Davison with] serum negative rheumatoid arthritis" when she did not have such a condition. (Id. at 315–20).

### UMIA's Claims-Handling

6. While the MMLP reviewed Plaintiffs' claims, UMIA—Dr. Arguelles and the AOC's insurance company—began its coverage investigation. UMIA Claim

2

Consultant Kim Day was assigned to evaluate Plaintiffs' claims. (Doc. 288 at 98).

7.  Meanwhile, UMIA provided Dr. Arguelles's defense under its reservation of rights. (Doc. 281-1 at 273–84). Attorney Gary Kalkstein represented Dr. Arguelles on behalf of UMIA and regularly communicated with Day throughout the claims' investigation.

8.  During the MMLP's review, the parties learned that the federal government was investigating Dr. Arguelles for engaging in allegedly fraudulent activity. (*See, e.g., id.* at 94).

9.  Meanwhile, Fryer—represented by attorney Michael Eiselein—filed a medical malpractice claim against Dr. Arguelles and the AOC in Montana State District Court in October 2018. (*Id.* at 174).

10. Two months later, Davison—also represented by Eiselein—filed a medical malpractice claim against Dr. Arguelles and the AOC in Montana State District Court. (*Id.* at 168).

11. Subsequently, in December 2018, Day submitted a Reserve Report to UMIA requesting authority to settle the claims. Through her evaluation, Day reported to UMIA that "Davison did not have rheumatoid arthritis and likely never did." (*Id.* at 163). She relayed Davison's health conditions, noting that

3

Davison "had serious psoriasis as [a] result of Remicade use and require[s] life[-]long medication." (*Id.*).

12. Day acknowledged that "Dr. Arguelles [was] under investigation by the Department of Justice . . . . and [that] the investigation [was] currently ongoing and active." (*Id.* at 161). Nonetheless, she reported that UMIA's liability was "clear" and that she "[w]ould like to fast track [Davison's] case towards resolution." (*Id.* at 164).

13. Approximately one year later and upon Kalkstein's request, Eiselein provided UMIA with Davison's settlement brochure. Eiselein requested $865,069.59 to settle Davison's claim. (*Id.* at 14–20).

14. One month later, Eiselein produced Fryer's settlement brochure and requested $856,041 to settle her claim. (*Id.* at 194–98).

15. UMIA did not settle the claims at this time.

16. The investigation continued, and Day produced another set of Reserve Reports to UMIA in January 2020. (*Id.* at 82–92, 108–18).

17. In those Reports, Day reviewed Plaintiffs' health histories and Dr. Arguelles's treatment of them. (*Id.* at 86–89, 112–14).

18. Day provided an update on the Department of Justice's investigation, indicating that the Department was looking into "whether Dr. Arguelles . . .

4

benefit[ed] from making unnecessary claims for diseases his patients did not have." (*Id.* at 83).

19. Day also included summaries of UMIA expert opinions analyzing Dr. Arguelles's standard of care relative to Plaintiffs' treatment. Dr. John McCahan, a board-certified rheumatologist, stated that "he was frankly taken back by what he [felt] was the magnitude and scale of Dr. Arguelles'[s] egregious malpractice and inappropriate, costly and dangerous treatment and the damaging consequences to each of [the] patients." (*Id.* at 89). Dr. Suzanne Shaw, a board-certified radiologist, conducted a blind review of patient imaging. She noted the images' poor quality but otherwise saw nothing of interest besides minor degenerative changes. (*Id.*). When Dr. Shaw learned that the patient had been diagnosed with rheumatoid arthritis, "she asked if [the diagnosis] was a scam." (*Id.*).

20. Day again stated that UMIA's liability was "clear" and again "recommend[ed] attempting resolution of all . . . claims against Dr. Arguelles as soon as possible." (*Id.* at 91, 117). Day estimated a less than 10% global chance of a successful defense on each claim. (*Id.* at 92, 117).

21. In addition, Day requested settlement authority—up to $700,000 to resolve Fryer's case and up to $900,000 to resolve Davison's case. (*Id.*)

22. Two months later, in March 2020, UMIA representatives convened via a Large Loss Committee to discuss Plaintiffs' claims. (Doc. 289 at 200–01). The Committee was made up of UMIA's Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, and Chief Medical Officer, among others. (*Id.* at 100). The Committee ultimately decided not to grant Day settlement authority after considerable discussion about her ability to obtain medical bills and liens in support of Plaintiffs' damages. (*Id.* at 200–02; Doc. 281-1 at 136).

23. Thereafter, in June 2020, Day again renewed her request to resolve the cases. She noted that there were "several potential options to negotiate [Fryer's] case" (Doc. 281-1 at 93, 104) and reported that UMIA had "until 7/10/20 to answer [Davison's lawsuit] or open settlement discussions" (*id.* at 130). She did not expect additional extensions to be granted by Plaintiffs. (*Id.*). Day had "used up all [her] political capital to get [Plaintiffs] to extend out, and out and out." (*Id.* at 58).

24. In early July 2020, UMIA's Chief Legal Officer, Nicholas Ghiselli, indicated that he was "not on board with [Day] resolving [the] cases on her own." (*Id.* at 60). He remarked that there was "little to no work up on damages," and his "message [was] this: [p]ay blindly, or else we will move forward with litigation. . . . [W]e have direct control over much of our indemnity. This is . . . once again, another opportunity to exercise our control." (*Id.*).

6

25.    As the parties continued to discuss settlement options, UMIA's then-Director of Early Intervention, Shelly Davis, proposed potential settlement amounts, noting and factoring Plaintiffs' "significantly reduced [life expectancies]." (*Id.* at 74).

26.    Meanwhile, Eiselein provided UMIA with Davison's lien information. (Doc. 281-1 at 139–53).  He also amended Plaintiffs' state-court complaints, adding a fraud claim. (*Id.* at 10, 190).

27.    By August 2020—as the parties continued to entertain settlement negotiations—Davis emailed Day stating that UMIA was "in no hurry to settle [the] cases." (*Id.* at 69).

28.    A few days later, Davis emailed UMIA team lead, Julia Houser, stating that she "d[id] not see any rush to resolve [Plaintiffs'] cases, as time [was] on [their] side." (*Id.* at 70).  She believed that Dr. Arguelles's alleged criminal acts gave UMIA a "'no coverage' argument" and that evidence gained during discovery would support UMIA' s position. (*Id.*).

29.    By October 2020, Eiselein produced Fryer's lien and bill information to Kalkstein. (*Id.* at 21–26).

30.    Meanwhile, Eiselein learned for the first time that the actual coverage under UMIA's policies totaled $2 million even though two years earlier he was

"given to understand" that "the limit of the applicable insurance coverage [was] $1,000,000." (*Id.* at 27; Doc. 290 at 49).

31.    The next month, the parties scheduled mediation. However, UMIA cancelled at the last minute without prior notice to Eiselein or Plaintiffs. (Doc. 281-1 at 78). According to Davis, Dr. Arguelles potentially planned to invoke his Fifth Amendment right not to incriminate himself and thus, UMIA "decided it [was] in [their] best interest to do some more discovery and look into how UMIA should be best represented going forward." (*Id.*). Davis stated that UMIA would "not be offering any money [for] these cases at this time." (*Id.*).

32.    Subsequently, in December 2020, and without prior notice to Eiselein or Plaintiffs, UMIA filed a declaratory judgment action, naming Plaintiffs as parties.

33.    When Plaintiffs received this news, Fryer cried and asked her husband, "what more could [UMIA] do to me?" (Doc. 290 at 254). Davison recalled that she thought she and her husband were "going to lose everything." (*Id.* at 248).

*Settlement and UTPA Lawsuit*

34.    Davison ultimately settled her claims against Dr. Arguelles and the AOC for $375,000 in February 2021. (Doc. 285-1 at 1–4). UMIA paid $250,000 and Dr. Arguelles paid the remaining $125,000.

35. In an email to the Large Loss Committee, Davis reported that: "We are truly better together, as both time and many minds commenting on these cases saved us much money in indemnity." (Doc. 281-1 at 325).

36. By April 2021, Fryer settled her claims against Dr. Arguelles and the AOC for $480,000. (Doc. 285-1 at 14–17). UMIA paid $250,000 and Dr. Arguelles paid the remaining $230,000.

37. On January 13, 2022, Plaintiffs sued UMIA for violating the Montana Unfair Trade Practices Act ("UTPA"), alleging that the three-to-four-year period UMIA took to settle their claims against Dr. Arguelles and the AOC amounted to unreasonable claims-handling practice. (Doc. 281-1 at 326).

*Jury Verdict and Award*

38. The jury returned a verdict on November 10, 2025, finding that UMIA had violated the UTPA, and awarded each Plaintiff $3 million in compensatory damages. (Doc. 267).

39. The jury also found UMIA liable for actual malice or fraud. (*Id.*). The Court conducted a separate hearing pursuant to Montana law, after which the jury awarded each Plaintiff $4.5 million in punitive damages. (Doc. 268).

///

///

9

## CONCLUSIONS OF LAW

### *In General*

1.  A federal court, sitting in diversity, must apply state substantive law when determining punitive damages. *See Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

2.  In Montana, a district court considers the following matters when reviewing a jury award of punitive damages:

> (1) the nature and reprehensibility of the defendant's wrongdoing; (2) the extent of the defendant's wrongdoing; (3) the intent of the defendant in committing the wrong; (4) the profitability of the defendant's wrongdoing, if applicable; (5) the amount of actual damages awarded by the jury; (6) the defendant's net worth; (7) previous awards of punitive or exemplary damages against the defendant based on the same wrongful act; (8) potential or prior criminal sanctions against the defendant based on the same wrongful act; and (9) any other circumstances that may operate to increase or reduce, without wholly defeating, punitive damages.

Mont. Code Ann. § 27-1-221(b)–(c) (citation modified).

3.  These codified safeguards "ensure that an award of punitive damages is not greater than reasonably necessary to punish and deter." *Finstad v. W.R. Grace & Co.*, 8 P.3d 778, 787 (Mont. 2000).

4.  Additionally, and in light of the United States Supreme Court's "concerns over the imprecise manner in which punitive damages systems are administered," a district court should consider three guideposts when reviewing punitive

damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 417–18 (2003).

### *Nature and Reprehensibility of UMIA's Wrongdoing*

5.    "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419.

6.    A defendant's reprehensibility may be determined by whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was a result of intentional malice, trickery, or deceit, or mere accident.

*Seltzer v. Morton*, 154 P.3d 561, 605 (Mont. 2007) (quoting *State Farm*, 538 U.S. at 419).

7.    Although Dr. Arguelles's treatment caused Plaintiffs' life-long physical injuries, UMIA's actions—prolonging settlement—exacerbated and

capitalized on Plaintiffs' deteriorating health in direct contravention of the UTPA.

8.  UMIA knew of and took advantage of Plaintiffs' vulnerabilities and reduced life expectancies by repeatedly ignoring and rebuffing Day's evaluations and requests for settlement authority.

9.  UMIA disregarded the overwhelming likelihood of "clear" liability and the near-certain probability that, by taking the medical malpractice cases to trial, a judgment in excess of the policy limits might be awarded.

10.  UMIA knowingly prioritized control, time management, and indemnity over its obligation to promptly settle Plaintiffs' claims.

11.  Over a span of three to four years, Plaintiffs experienced fear, anxiety, and distress.  As Fryer explained: "[It was] like riding a roller coaster. . . . And anytime they c[a]me up with something new, [it was] more frustrating." (Doc. 290 at 243).

12.  Given Plaintiffs' significant health issues and "significantly reduced [life expectancies]" (Doc. 281-1 at 74), UMIA's repeated decisions to delay the settlement of Plaintiffs' claims, where liability was reasonably clear, was extremely reprehensible.

13.  UMIA's indifference to Plaintiffs' declining health, disregard of its claims' consultant's recommendations, and prioritization of indemnity over

settlement support affirming the jury's punitive damages award.

### The Extent of UMIA's Wrongdoing

14.    "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *State Farm*, 538 U.S. at 423.

15.    Day's Reserve Reports repeatedly identified Plaintiffs' permanent and serious injuries sustained as a result of Dr. Arguelles's misdiagnoses.

16.    Day's Reserve Reports also identified numerous expert opinions finding that Dr. Arguelles had acted outside of the standard of care.

17.    Day requested authority to settle Plaintiffs' claims as early as December 2018 based upon her evaluation. (Doc. 281-1 at 163).  Day continued to request authority to settle into June 2020. (*Id.* at 93, 104).

18.    Despite Day's requests, UMIA's response was to deny Day any settlement authority and remove her from the settlement process. (*Id.* at 60).

19.    UMIA's purposeful and prolonged wrongdoing—failing to promptly settle when liability was reasonably clear—went on for years and caused Plaintiffs' significant anxiety, fear, and stress.

20.    UMIA's sustained unlawful conduct therefore supports affirming the jury's punitive damages award.

### The Intent of UMIA in Committing the Wrong

21.    It is clear from the evidence presented at trial that UMIA's intent in delaying

13

the settlement of Plaintiffs' claims was to take advantage of Plaintiffs' deteriorating health and financial circumstances and force them to settle their claims for less than they were worth and thus save UMIA money (their indemnity). (*Id.* at 60, 69, 74, 325).

22. Day provided extensive reporting and analyses of Plaintiffs' declining health conditions. With this knowledge, UMIA proposed low settlement amounts, noting and factoring Plaintiffs' "significantly reduced [life expectancies]." (*Id.* at 74).

23. UMIA was further provided with ample evidence of Dr. Arguelles's breach of the standard of care as well as Day's assessment to "fast track" settlement. However, the Large Loss Committee disregarded both the evidence of Dr. Arguelles's liability and Day's requests, thereby forcing Day to exhaust her political capital with Plaintiffs and stall settlement.

24. Additionally, Eiselein believed for over two years that only $1 million in policy limits were available to Plaintiffs, even though AOC's policy and Dr. Arguelles's policy *each* provided $1 million in coverage. *See Lorang v. Fortis Ins.*, 192 P.3d 186, 210 (Mont. 2008) ("[P]unitive damages may be assessed against an insurer" for misrepresenting coverage provisions of an insurance policy.). Plaintiffs' eventual demand amounts did not alter UMIA's obligation to accurately disclose the policies' limits under Montana law. UMIA's two-

year concealment of this material fact deprived Plaintiffs of their prompt payment.

25. UMIA's indifference of Plaintiffs' health, disregard for Day's findings and recommendations, and concealment of its policy coverage demonstrate its intent to stall settlement and save indemnity.

26. UMIA's intentional wrongdoing therefore supports affirming the jury's punitive damages award.

## *The Profitability of UMIA's Wrongdoing*

27. The Court did not allow the parties to offer evidence of UMIA's profitability at trial and therefore the profitability of UMIA's wrongdoing is inapplicable to this analysis.

28. This factor is neutral to the punitive damages analysis.

## *The Amount of Actual Damages Awarded by the Jury*

29. "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426.

30. "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425 (comparing a 4-to-1 ratio to a 500-to-1 ratio).

31.    "The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

32.    The compensatory award in this case was substantial; each Plaintiff was awarded $3 million for approximately three to four years of emotional distress.

33.    Each Plaintiff was then awarded $4.5 million in punitive damages. The ratio of punitive to compensatory damages is therefore 1.5 to 1.

34.    The harm arose from an economic injury, not from physical assault or trauma. Much of Plaintiffs' distress was caused by the worry, grief, and disappointment they suffered as a result of UMIA's actions.

35.    The jury considered only Plaintiffs' harms caused by UMIA because the Court excluded evidence of other claimants harmed by Dr. Arguelles's care as well as other bad faith cases that named UMIA.

36.    Considering the single-digit ratio and that the jury heard facts relevant only to Plaintiffs' claims, this factor supports affirming the jury's punitive damages award.

*UMIA's Net Worth*

37.    A jury's ability to observe a witness's demeanor is considered significant in assessing credibility and the reviewing court must conduct a highly deferential

16

view of credibility determinations. *See Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 672 (9th Cir. 1990).

38. In determining punitive damages, the jury was instructed to consider UMIA and Constellation, Inc.'s "financial affairs, financial condition, and net worth." (Doc. 272 at 43). The jury was also instructed to consider "the wealth of [UMIA and Constellation, Inc.]." (*Id.* at 44).

39. At trial, Plaintiffs introduced evidence of Defendants' net worth. (Doc. 298 at 105, 111–12). In the Answer to Plaintiffs' Complaint, UMIA admitted that its net worth exceeded $200 million (Doc. 281-1 at 328, 339). Constellation, Inc. admitted its net worth was $1 billion (*Id.* at 328, 340).

40. In defense, Julia Houser testified that UMIA's net worth was approximately $96 million. (Doc. 298 at 107). She then testified that Constellation, Inc.'s net worth was approximately $200 million. (*Id.*).

41. The jury was permitted to weigh the credibility of Plaintiffs' evidence against UMIA's witness testimony.

42. Given that the jury's credibility determination is a foundational element of the trial process, the Court does not disturb the jury's findings and concludes that UMIA and Constellation Inc.'s significant net worth supports affirming the punitive damages award.

*Previous Awards of Punitive or Exemplary Damages Against UMIA*

43.   There are no relevant prior awards of punitive or exemplary damages against UMIA.  This factor is therefore neutral.

*Potential or Prior Criminal Sanctions Based on the Same Wrongful Act*

44.   There are no potential or prior criminal sanctions based on the same act alleged by Plaintiffs.  This factor is therefore neutral.

*Other Circumstances*

45.   There are no other circumstances relevant to the Court's consideration.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that the jury's punitive damages award is AFFIRMED.

DATED this 29th day of July, 2026.

SUSAN P. WATTERS
United States District Judge